## STROBLE *v.* CALIFORNIA.

No. 373.   Argued March 6, 1952.—Decided April 7, 1952.

*John D. Gray* and *A. L. Wirin* argued the cause for petitioner. With them on the brief were *Fred Okrand, Clore Warne* and *Loren Miller.*

*Adolph Alexander* argued the cause for respondent. With him on the brief were *Edmund G. Brown,* Attorney General of California, *William V. O'Connor,* Chief Deputy Attorney General, and *Frank W. Richards,* Deputy Attorney General.

MR. JUSTICE CLARK delivered the opinion of the Court.

Petitioner has been convicted of first degree murder and sentenced to death. He asks this Court to reverse his conviction as wanting in that due process of law guaranteed against state encroachment by the Fourteenth Amendment. Petitioner claims (1) that his conviction was based in part on a coerced confession; (2) that a fair trial was impossible because of inflammatory newspaper reports inspired by the District Attorney; (3) that he was in effect deprived of counsel in the course of his sanity hearing; (4) that there was an unwarranted delay in his arraignment; and (5) that the prosecuting officers unjustifiably refused to permit an attorney to consult petitioner shortly after petitioner's arrest. Petitioner urges that each of the first three circumstances is independently a deprivation of due process; and that, in any event, the combination of all five circumstances operated to deprive him of a fair trial.

The murder of which petitioner has been convicted occurred on Monday, November 14, 1949; the victim was a girl, aged 6. Petitioner was arrested around noon on Thursday, November 17, 1949. He was arraigned in the Los Angeles Municipal Court at 10 o'clock the following morning, and the City Public Defender was appointed to represent him. A preliminary hearing was held on Monday, November 21, and petitioner was bound over for trial in the Superior Court of Los Angeles County. On November 25, petitioner was arraigned in the Superior Court and the County Public Defender was appointed as his counsel. From that point until the conclusion of his trial, petitioner was vigorously defended by two deputies of the County Public Defender's office. On December 2, 1949, petitioner pleaded both "not guilty" and "not guilty by reason of insanity." The case came on for trial on January 3, 1950. The issue of guilt was tried to a

jury, which, on January 19, returned a verdict of guilty of first degree murder, without recommendation; under California law, this automatically fixed the penalty at death. On January 20, 1950, petitioner waived jury trial on the issue of insanity, and the court found that petitioner was sane at the time of committing the offense. On January 27, 1950, on petitioner's motion, a private attorney was substituted as petitioner's counsel. On February 6, 1950, the trial court, after a hearing, denied petitioner's motion for a new trial, motion in arrest of judgment, and motion to set aside the waiver of jury trial on the issue of insanity.

On appeal the Supreme Court of California unanimously affirmed the conviction. 36 Cal. 2d 615, 226 P. 2d 330. We granted certiorari because of the seriousness of petitioner's allegations under the Due Process Clause. 342 U. S. 811.

The facts leading to petitioner's arrest may be summarized as follows:

In the early morning of November 15, 1949, the victim's body was found behind the incinerator in the back yard of the home of petitioner's daughter and son-in-law. It was wrapped in a blanket and covered with boxes. A necktie was wound twice around the child's neck. An axe, knife, and hammer were found in the vicinity of the body. An autopsy revealed that the immediate cause of death was asphyxia due to strangulation. It also revealed numerous lacerations on the top and sides of the head, six skull fractures, a deep laceration in the back of the neck, abrasions and discolorations on the child's back, irritation of the external genitalia, and three puncture wounds in the chest.

Suspicion immediately focused on petitioner, who had been visiting his daughter and son-in-law until the day before, when he had disappeared. Some six months before, petitioner had jumped bail on a charge of molesting a

small girl and had never since been apprehended. At approximately 11:50 a. m. on November 17, as petitioner entered the bar of a restaurant in downtown Los Angeles, a civilian recognized him as the man whom the police were seeking in connection with the murder. The civilian summoned a police officer, Carlson, who thereupon arrested petitioner.

From this point on there are some conflicts in the testimony, as noted below. Carlson, accompanied by the civilian, took petitioner to the park foreman's office in nearby Pershing Square, where Carlson called headquarters to report his arrest of petitioner and to request that a police car be sent. Then Carlson, in the presence of the civilian and the park foreman, proceeded to search petitioner. Carlson had petitioner stand facing the wall with his hands raised against it and his feet away from it. While being searched in this position, petitioner pulled his feet closer to the wall and then Carlson, with the side of his shoe, kicked petitioner's shoes at the toes in order to push petitioner's feet back into position. The civilian testified that "possibly" Carlson's foot slipped and hit petitioner's shin "once or twice." Carlson testified that at no time did he "strike" petitioner or "inflict any kind of physical injury on him."[1] No marks were found on petitioner when he was examined by a physician a few hours later. It also appears that after searching petitioner, Carlson took out his blackjack, held it under petitioner's nose, and said either, "Do you know what this is for?" or "Have you seen this?" Petitioner makes no claim that Carlson used the blackjack on him. While waiting for the police car to arrive the civilian asked petitioner whether he was guilty of the murder, and petitioner "mumbled something under his breath that sounded like 'I guess I am.'" Thereupon, according to the civilian,

---

[1] Petitioner himself did not testify at the trial.

the park foreman slapped petitioner with his open hand and knocked off petitioner's glasses.

Without undue delay the police car arrived and petitioner was driven to the District Attorney's office in the Hall of Justice Building. While en route one of the police officers in the car began a conversation with petitioner by asking him where he had been. Petitioner replied, "Well, after that terrible thing happened, I went down to the beach, down to Ocean Park. I was going to do away with myself." The officer said, "What do you mean by that terrible thing?" to which petitioner replied, "When the little girl got killed." The officer then interposed, "Do you mean when you killed the little girl?" and petitioner answered, "Yes. I was going down to the beach. I was going to jump in the ocean and commit suicide but I decided that I would have to pay on the other side so I might as well come back and pay on this side." The officer testified that he did not promise petitioner any reward or extend to him any hope of immunity, and that he did not use force or threats of any kind. The officer's entire testimony regarding this conversation is uncontradicted, and, insofar as it contains a confession by petitioner, no objection was made at the trial on the ground that such confession was involuntary.

Petitioner did object at the trial, however, to the introduction in evidence of a confession which he made after his arrival in the District Attorney's office. Petitioner was brought to the District Attorney's office at approximately 1 p. m., and an assistant district attorney began questioning petitioner in the presence of some nineteen persons, attaches of the District Attorney and the police department. The entire proceeding was recorded on a recording machine which had been set in operation before petitioner's arrival. Petitioner stated that on the afternoon of November 14, his victim came to the home of petitioner's daughter, where petitioner was visiting; he

took his victim into the bedroom and made advances upon her; when she began to scream, he became frightened, got hold of her throat, and squeezed it until she became quiet; she started to squirm again, so he took a necktie from the dresser and tied it around her neck; when she continued to move, he took her off the bed, wrapped her in a blanket, and hit her on the temple with a hammer which he had obtained from the kitchen drawer; he then dragged her across the back yard to the incinerator, returned to the kitchen to get an ice pick, and pushed the pick into her three times in an effort to reach her heart; next he got an axe from the garage and hit her on the head and backbone; finally he got a knife from the kitchen and stabbed her in the back of the neck, covered her body with boxes, and left for Ocean Park, a beach resort within the city of Los Angeles, where he remained for the three nights before his apprehension.

Towards the end of the recording petitioner stated that the officers had not threatened or abused him in any way, either in the park foreman's office or the District Attorney's office. The recording disclosed no mistreatment at the time of the making of the confession.

The questioning of petitioner in the District Attorney's office lasted approximately two hours. About 45 minutes after petitioner had begun his confession, an attorney, Mr. Gray, called at the waiting room of the District Attorney's office and asked for the assistants handling the case. Upon being advised that they were busy he then asked for the District Attorney. Upon being told that the District Attorney was also in conference and could not be disturbed, Mr. Gray asked to see petitioner. It is uncontradicted that at that point Mr. Gray stated to a police department inspector who was present in the waiting room that he "just wanted to hear from [petitioner's] lips whether or not" petitioner had committed the murder, "so that [he] could report back" to petitioner's son-in-

law.[2]  Mr. Gray was denied admission to the room in which petitioner was being questioned, but talked to an assistant district attorney after the confession had been completed.  Mr. Gray was permitted to see petitioner that evening.  Mr. Gray did not represent petitioner during the trial, but on the motion for new trial was substituted, at petitioner's request, for the Public Defender.

Shortly after 3 p. m., petitioner was taken from the District Attorney's office to Dr. Marcus Crahan, a physician in charge of the hospital of the county jail, for a physical and mental examination.  Dr. Crahan, when called by petitioner as a witness at the trial, testified that he examined petitioner carefully, including his feet and shins, but found no bruises or abrasions of any kind. According to Dr. Crahan, during the examination petitioner stated that since his arrest the police officers had been very kind to him and that he had not been "mistreated" and had been given "every consideration."  Petitioner related to Dr. Crahan the details of the killing.

Petitioner was lodged in the county jail for the night and was arraigned in the Municipal Court at 10 o'clock the following morning, November 18.

Thereafter, in the six weeks' period between the date of his arraignment and the beginning of his trial, petitioner was examined by four psychiatrists [3] and one clinical psychologist.  To each of these persons he stated that he had killed his victim and recounted, in greater or lesser detail, just how he had gone about the killing.  These experts, when testifying at the trial (two having been called by the prosecution and three by the petitioner), related to the jury what petitioner had told them.  Petitioner did

---

[2] R. 287–288 (testimony of John D. Gray); see also R. 210 (testimony of Inspector J. A. Donahoe).

[3] Three of these psychiatrists had been appointed by the trial court pursuant to Cal. Penal Code, 1951, § 1027.

not object at the time, and makes no objection now, to the admission of these confessions on the ground that they were involuntary.

The trial court charged the jury that it could not consider a confession unless it was voluntary; that the jury was the sole judge of voluntariness; and that a confession was not voluntary when obtained by any kind of violence, abuse, or threat, or by "any coaxing, cajoling, or menacing influence which induces in the mind of the defendant the belief or hope that he will gain some advantage by making a confession." The court further charged that the fact that a confession is made while an accused is under arrest and being detained, or when he is not represented by counsel, or without his having been told that any statement he makes may be used against him, does not in itself make the confession involuntary, but is one circumstance to be considered in determining the voluntariness of the confession. The court admonished the jury to view with caution the testimony of any witness which purports to relate an oral confession by a defendant.

The California Supreme Court stated: "We may assume that, as a matter of law under the circumstances shown," petitioner's confession in the District Attorney's office was involuntary.[4] The court felt, however, that the use of that confession "could not have affected the fairness of [petitioner's] trial," because petitioner "thereafter made at least five confessions, of materially similar substance and unquestioned admissibility, which were put in evidence," and because "[i]t does not appear that the outcome of the trial would have differed" if that confession had been excluded.[5] Therefore the court concluded that use of the confession had not deprived petitioner of due process.

[4] 36 Cal. 2d at 623, 226 P. 2d at 335.
[5] 36 Cal. 2d at 623, 226 P. 2d at 336.

We take a somewhat different view. If the confession which petitioner made in the District Attorney's office was in fact involuntary, the conviction cannot stand, even though the evidence apart from that confession might have been sufficient to sustain the jury's verdict. *Malinski* v. *New York*, 324 U. S. 401, 402, 404 (1945); *Lyons* v. *Oklahoma*, 322 U. S. 596, 597, n. 1 (1944). That confession was a prominent feature of the trial. First a stenographic transcript of the confession was read, and then a wire recording of it was played to the jury. Under these circumstances we cannot say that the jury's verdict could not have been based, at least in part, on the confession made in the District Attorney's office. Since we take this view, we cannot merely "assume," as did the state supreme court, that that confession was involuntary, but must go on to determine the question of voluntariness.

Petitioner does not so much as suggest that the action of any officer during the taking of the confession was accompanied by force or threats. His sole contention is that the incidents in the park foreman's office, coupled with the presence of nineteen officers in the District Attorney's office, render the confession which he made in the latter office involuntary.

This Court has frequently stated that, when faced with the question whether there has been a violation of the Due Process Clause of the Fourteenth Amendment by the introduction of an involuntary confession, it must make an independent determination on the undisputed facts. *Malinski* v. *New York, supra*, at 404, and cases cited; *id.*, at 438 (dissenting opinion). We adhere to that rule. In the present case, however, we need not confine ourselves to the undisputed facts; for, even if we give petitioner the benefit of every doubt as to the alleged coercion, we do not think it can fairly be said that his confession in the District Attorney's office was coercion's product.

Whatever occurred in the park foreman's office occurred at least an hour before he began his confession in the District Attorney's office, and was not accompanied by any demand that petitioner implicate himself.  Likewise his statement to the officer while on the way to the District Attorney's office was admittedly voluntary.  In the District Attorney's office, petitioner answered questions readily; there was none of the "pressure of unrelenting interrogation" which this Court condemned in *Watts* v. *Indiana,* 338 U. S. 49, 54 (1949).  Indeed, the record shows that from the time of his arrest until the time of his trial, petitioner was anxious to confess to anybody who would listen—and as much so after he had consulted with counsel as before.  His willingness to confess to the doctors who examined him, after he had been arraigned and counsel had been appointed, and in circumstances free of coercion, suggests strongly that petitioner had concluded, quite independently of any duress by the police, "that it was wise to make a clean breast of his guilt." See *Lyons* v. *Oklahoma, supra,* at 604.  In the light of all these circumstances, we are unable to say that petitioner's confession in the District Attorney's office was the result of coercion, either physical or psychological.

We turn now to petitioner's contention that the newspaper accounts of his arrest and confession were so inflammatory as to make a fair trial in the Los Angeles area impossible—even though a period of six weeks intervened between the day of his arrest and confession and the beginning of his trial.  Here we are not faced with any question as to the permissible scope of newspaper comment regarding pending litigation, see *Bridges* v. *California,* 314 U. S. 252 (1941); *Pennekamp* v. *Florida,* 328 U. S. 331 (1946); *Craig* v. *Harney,* 331 U. S. 367 (1947); but with the question whether newspaper accounts aroused such prejudice in the community that petitioner's trial was "fatally infected" with an absence of "that

fundamental fairness essential to the very concept of justice." *Lisenba* v. *California,* 314 U. S. 219, 236 (1941).

The search for and apprehension of petitioner was attended by much newspaper publicity. Between the time of the murder and the time of petitioner's arrest, newspapers of general circulation in the Los Angeles area featured in banner headlines the "manhunt" which the police were conducting for petitioner. On the day of petitioner's arrest these newspapers printed extensive excerpts from his confession in the District Attorney's office, the details of the confession having been released to the press by the District Attorney at periodic intervals while petitioner was giving the confession. On the following Monday, four days later, Los Angeles newspapers reprinted the full text of that confession as it was read into the record at the preliminary hearing. Most of these events were given top billing on the front page of the papers, and were accompanied by large headlines. Petitioner was variously described, both in headlines and in the text of news stories, as a "werewolf," a "fiend," a "sex-mad killer," and the like. The District Attorney announced to the press his belief that petitioner was guilty and sane.

The spate of newspaper publicity accompanying petitioner's arrest and confession soon abated, however. During the month of December, 1949, petitioner made the headlines of Los Angeles newspapers only infrequently, such as when he entered a plea of "not guilty" on December 2. Petitioner points to certain other events which occurred during that month. The Governor of the State called a special session of the legislature to consider, among other things, the problem of "sex crimes"; the Governor called a one-day conference of law enforcement officers to consider the same subject; a committee of the state legislature investigating sex crimes held hearings in Los Angeles, at which the District Attorney stated that he did not see why sex offenders "shouldn't be disposed of

the same way" as mad dogs; and various citizens' groups made proposals for studying and dealing with sex crimes. Los Angeles newspapers published accounts of each of these events, and the accounts at times made reference to the murder with which petitioner was charged.

Petitioner's trial itself was reported by Los Angeles newspapers, usually on inside pages. Petitioner makes no objection to this phase of the newspaper coverage except for the newspapers' occasional reference to petitioner as a "werewolf."

While we may deprecate the action of the District Attorney in releasing to the press, on the day of petitioner's arrest, certain details of the confession which petitioner made, we find that the transcript of that confession was read into the record at the preliminary hearing in the Municipal Court on November 21, four days later. Thus in any event the confession would have become available to the press at that time, for "[w]hat transpires in the court room is public property." *Craig* v. *Harney, supra,* at 374. Petitioner has not shown how the publication of a portion of that confession four days earlier prejudiced the jury in arriving at their verdict two months thereafter.

We agree with the California Supreme Court that petitioner has failed to show that the newspaper accounts aroused against him such prejudice in the community as to "necessarily prevent a fair trial," *Lisenba* v. *California, supra,* at 236. At the outset, it should be noted that at no point did petitioner move for a change of venue, although the California Penal Code explicitly provides that whenever "a fair and impartial trial cannot be had in the county" in which a criminal action is pending, the action may, upon motion of the defendant, be removed to "the proper court of some convenient county free from a like objection." [6] Of course petitioner's failure to make such

---

[6] Cal. Penal Code, 1951, §§ 1033, 1035.

a motion is not dispositive of the issue here, since the state court did not decide against petitioner on this ground but rather rejected on the merits his federal constitutional claim.[7]   But, in an effort to determine whether there was public hysteria or widespread community prejudice against petitioner at the time of his trial, we think it significant that two deputy public defenders who were vigorous in petitioner's defense throughout the trial, saw no occasion to seek a transfer of the action to another county on the ground that prejudicial newspaper accounts had made it impossible for petitioner to obtain a fair trial in the Superior Court of Los Angeles County.

The matter of prejudicial newspaper accounts was first brought to the trial court's attention after petitioner's conviction, as one of the grounds in support of a motion for a new trial.   At that time petitioner's present attorney urged that petitioner had been "deprived of the presumption of innocence by the premature release by the District Attorney's office of the details of the confession," and offered in support of that allegation certain Los Angeles newspapers published at the time of petitioner's arrest.   The trial court replied as follows:[8]

> "[T]he jurors were all thoroughly examined and all definitely stated that they would give to the defendant the benefit of the presumption of innocence. . . .   There is nothing to show those jurors ever saw those papers or ever read those papers. They were fully examined so far as defense counsel desired as to any knowledge or information they might have of the case."[8]

---

[7] See *Grayson* v. *Harris*, 267 U. S. 352, 358 (1925); *International Steel & Iron Co.* v. *National Surety Co.*, 297 U. S. 657, 665–666 (1936); *Indiana ex rel. Anderson* v. *Brand*, 303 U. S. 95, 98 (1938); *Takahashi* v. *Fish & Game Comm'n*, 334 U. S. 410, 414, n. 4 (1948).

[8] R. 361–362.

Petitioner does not challenge this statement of the court. Indeed, at no stage of the proceedings has petitioner offered so much as an affidavit to prove that any juror was in fact prejudiced by the newspaper stories. He asks this Court simply to read those stories and then to declare, over the contrary finding of two state courts, that they necessarily deprived him of due process. That we cannot do, at least where, as here, the inflammatory newspaper accounts appeared approximately six weeks before the beginning of petitioner's trial, and there is no affirmative showing that any community prejudice ever existed or in any way affected the deliberation of the jury. It is also significant that in this case the confession which was one of the most prominent features of the newspaper accounts was made voluntarily and was introduced in evidence at the trial itself.

We find no substance in petitioner's contention that he was deprived of effective counsel at a critical point in the case, namely, when he waived trial by jury on the issue of insanity. The attorney who consulted with petitioner as to whether he should make such a waiver was the Public Defender himself, although prior to that time two deputy public defenders had handled the case in court. The Public Defender took this action because the trial court, at the conclusion of the trial on the issue of guilt, had requested that he personally attend the trial on the insanity issue.[9] We fail to see how this action harmed petitioner. As the California Supreme Court found, the Public Defender "was familiar with the case, having read the daily transcript and consulted with and advised [his two deputies] and interviewed witnesses during the trial";[10] moreover, before consulting with petitioner on the waiver question,

---

[9] The trial court made this request as a result of certain conduct on the part of one of the deputy public defenders, set forth in the opinion below at 36 Cal. 2d 628, 226 P. 2d 338–339.

[10] 36 Cal. 2d at 628, 226 P. 2d at 338.

he discussed the matter with his two deputies. Thereafter, petitioner twice stated in open court, in reply to inquiries by the trial judge, that he wished to waive a jury trial on the issue of insanity. Furthermore, there was no real question as to petitioner's sanity. He introduced no additional evidence at the sanity hearing; instead the parties stipulated that the sole evidence would be that adduced at the trial on the issue of guilt, plus the complete reports of the psychiatrists who had testified at that trial.[11] Every psychiatrist who had testified, whether on behalf of petitioner or on behalf of the prosecution, had reached the conclusion that petitioner was sane. On the motion for new trial, when petitioner's present attorney sought to set aside the waiver of jury trial on the issue of insanity, he offered no new evidence relating to petitioner's mental state and did not indicate that any such evidence was available. We conclude that petitioner received the full assistance of competent counsel in deciding that he wanted the insanity issue tried to the court. On that question, as on all others, he has been afforded "the assistance of zealous and earnest counsel from arraignment to final argument in this Court." *Avery* v. *Alabama,* 308 U. S. 444, 450 (1940).[12]

Nor can we agree with petitioner that a combination of these grounds with other circumstances, namely, unwarranted delay in arraignment and refusal to permit counsel

---

[11] At no point has petitioner challenged that stipulation. Indeed, the stipulation had been entered into by one of the deputy public defenders, in whom petitioner states he had complete confidence, prior to the time the court asked the Public Defender to be personally present at the insanity trial.

[12] In *People* v. *Adamson,* 34 Cal. 2d 320, 333, 210 P. 2d 13, 19 (1949), the Supreme Court of California had this to say about this same Public Defender and his office: "This court can take judicial notice, too, that it would be difficult to find in California any lawyers more experienced or better qualified in defending criminal cases than the Public Defender of Los Angeles County and his staff."

to consult petitioner during the making of the confession, amounts to such unfairness as to deny due process. The arraignment was had within less than twenty-four hours after the arrest. The officials questioned petitioner only during the two-hour period in the District Attorney's office, described above. The remainder of that afternoon was devoted to a physical and mental examination, to which petitioner makes no objection. Counsel called on petitioner at the county jail at 9:30 p. m. the evening of the arrest; presumably petitioner remained alone from then until the time of his arraignment the following morning. Although the California Supreme Court found that the failure promptly to arraign petitioner before a committing magistrate was a violation of state law,[13] that is not determinative of the issue before us. When this Court is asked to reverse a state court conviction as wanting in due process, illegal acts of state officials prior to trial are relevant only as they bear on petitioner's contention that he has been deprived of a fair trial, either through the use of a coerced confession or otherwise. *Lisenba* v. *California, supra,* at 234, 235, 240; *Lyons* v. *Oklahoma, supra,* at 597, n. 2; *Gallegos* v. *Nebraska,* 342 U. S. 55, 59, 65 (1951). Upon the facts of this case, we cannot hold that the illegal conduct of the law enforcement officers in not taking petitioner promptly before a committing magistrate, coerced the confession which he made in the District Attorney's office or in any other way deprived him of a fair and impartial trial.

As to the refusal of the prosecutors to admit counsel during their interrogation of petitioner, counsel stated that he had come to the District Attorney's office at the request of petitioner's son-in-law merely to inquire of petitioner as to his guilt. At no point did petitioner himself ask for counsel. In light of these facts, the Dis-

---

[13] Cal. Const., Art. I, § 8.

trict Attorney's refusal to interrupt the examination of petitioner, which had been proceeding for almost an hour, so that counsel could make inquiry for petitioner's son-in-law, does not constitute a deprivation of due process, either independently or in conjunction with all other circumstances in this case. While district attorneys should always honor a request of counsel for an interview with a client, upon the record before us there is no showing of prejudice. As was said in *Adams* v. *United States ex rel. McCann*, 317 U. S. 269, 281 (1942):

> "If the result of the adjudicatory process is not to be set at naught, it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality."

The judgment of the Supreme Court of California is

*Affirmed.*

Mr. Justice Frankfurter, dissenting.

One of the petitioner's grounds for attacking his conviction is that the trial lacked fundamental fairness because the district attorney himself initiated the intrusion of the press into the process of the trial. Such misconduct, the petitioner contends, subverted the adjudicatory process by which guilt is determined in Anglo-Saxon countries, so as to offend what the Due Process Clause of the Fourteenth Amendment protects. The issue was raised after verdict, and the Supreme Court of California might have disposed of the claim by ruling that it had not been made at the stage of the proceeding required by State law. That court, however, chose not to do so. It permitted the petitioner to invoke the Due Process Clause and thereby tendered a federal constitutional issue, as this Court recognizes, for our disposition.

The Supreme Court of California thus formulated the issue and indicated its conception of the allowable standards of fairness under the Due Process Clause:

"Defendant claims that he was deprived of a fair trial because the trial court did not protect him from, and the district attorney fostered, 'public pressure.' The killing and the subsequent search for defendant received much publicity. Immediately after defendant's arrest he was taken to the office of the district attorney, interrogated, and confessed. The district attorney, even before defendant completed his statement, released to the press details of the statement (including defendant's admissions of sex play with his victim and other children on occasions prior to the killing) and also announced his belief that defendant was guilty and sane. At the time of defendant's arrest and at the time of his trial (which began some seven weeks later) there was notorious widespread public excitement, sensationally exploited by newspaper, radio and television, concerning crimes against children and defendant's crime in particular. In these circumstances, defendant urges, it was impossible for him to obtain an unbiased jury, and due process requires a new trial even though there is no showing that any juror was actually influenced by the sensational publicity and the popular hysteria.

"In connection with his claim of 'public pressure' defendant also calls attention to the following statement by one of his counsel (veteran Deputy Public Defender John J. Hill; defendant was not then represented by his present private counsel) made during his closing argument: 'I wish to make this commentary with reference to just what has occurred before the Court took the Bench. I refer to the televising

and the pictures taken of the jury entering the box, and with counsel. . . . I don't like this added publicity in the case; and yet we conform, we cooperate with the men, our fellow human beings in the vocation, and therefore we accept it as part of what we have to expect in a case that has attracted so much attention, that has been so widely publicized, and concerning which there have been utterances over the radio, in the public press, which have unduly accentuated the importance of this case . . . [W]e shall not be influenced in the slightest degree in that calm deliberation, dispassionate discussion, and arriving at a verdict under the institutions under which we live, and concerning which we are proud: the American way of the conduct of a trial.'

"It seems that the traditional concept of the 'American way of the conduct of a trial,' particularly a trial for a sordid criminal offense such as that of defendant, includes both the aspects mentioned so understandingly by Mr. Hill: on the one hand overstimulation, by mass media of communication, of the usual public interest in that which is gruesome; on the other hand a trial by a judge and jury immune from the public passion." *People* v. *Stroble,* 36 Cal. 2d 615, 620–621, 226 P. 2d 330, 333–334.

Thus, on the California court's own reading of the record, circumstances tending to establish guilt and adduced outside the courtroom before the trial had even begun were avidly exploited by press and other media, actively promoted by the prosecutor. The State court sanctioned this as not only permissible but as an inevitable ingredient of American criminal justice. That sanction contradicts all our professions as to the establishment of guilt on the basis of what takes place in the courtroom, subject to judicial restrictions in producing proof and in the gen-

eral conduct of the proceedings. Jurors are of course human beings and even with the best of intentions in the world they are, in the well-known phrase of Holmes and Hughes, JJ., "extremely likely to be impregnated by the environing atmosphere." *Frank* v. *Mangum*, 237 U. S. 309, 345, 349. Precisely because the feeling of the outside world cannot, with the utmost care, be kept wholly outside the courtroom every endeavor must be taken in a civilized trial to keep it outside. To have the prosecutor himself feed the press with evidence that no self-restrained press ought to publish in anticipation of a trial is to make the State itself through the prosecutor, who wields its power, a conscious participant in trial by newspaper, instead of by those methods which centuries of experience have shown to be indispensable to the fair administration of justice. Science with all its advances has not given us instruments for determining when the impact of such newspaper exploitation has spent itself or whether the powerful impression bound to be made by such inflaming articles as here preceded the trial can be dissipated in the mind of the average juror by the tame and often pedestrian proceedings in court. Moreover, the Supreme Court of California found that at the time of the petitioner's trial "there was notorious widespread public excitement, sensationally exploited by newspaper, radio and television, concerning crimes against children and defendant's crime in particular."

And so I cannot agree to uphold a conviction which affirmatively treats newspaper participation instigated by the prosecutor as part of "the traditional concept of the 'American way of the conduct of a trial.'" Such passion as the newspapers stirred in this case can be explained (apart from mere commercial exploitation of revolting crime) only as want of confidence in the orderly course of justice. To allow such use of the press by the prosecution as the California court here left undisciplined, im-

plies either that the ascertainment of guilt cannot be left to the established processes of law or impatience with those calmer aspects of the judicial process which may not satisfy the natural, primitive, popular revulsion against horrible crime but do vindicate the sober second thoughts of a community. If guilt here is clear, the dignity of the law would be best enhanced by establishing that guilt wholly through the processes of law unaided by the infusion of extraneous passion. The moral health of the community is strengthened by according even the most miserable and pathetic criminal those rights which the Constitution has designed for all.

As to one other branch of the Court's opinion I must enter a *caveat*. This concerns the legal significance of petitioner's first confession, the one made to the district attorney. The California Supreme Court disposed of the .claim that this was a coerced confession by assuming that it was, but finding that the fact was immaterial because of later, so-called voluntary confessions. I agree with my brethren that this view disregards our decision in *Malinski* v. *New York,* 324 U. S. 401. But I cannot agree that, despite the refusal of the California Supreme Court to determine affirmatively the legal character of this first confession, this Court may do so here on its own independent interpretation of the facts. That conclusion does not at all follow from the fact that we make such a determination, at least upon the undisputed evidence, when the State court finds the confession to be free of constitutional defect. The question whether or not a confession is coerced involves a complex judgment upon facts inevitably entangled with assumptions and standards which are part and parcel of the ultimate issue of constitutionality. See *Baumgartner* v. *United States,* 322 U. S. 665, 670–671. The finding of "fact" that a confession is voluntary may involve the application of improper standards to the evidence, and thus the denial of a con-

stitutional right of the accused. But a wholly different situation is presented when a State court concludes that coercion entered into the inevitably complicated factors included in the totality of circumstances that constitutes a confession.

Moreover, items of evidence may be undisputed, but not their meaning. "Facts," except the most rudimentary, are not like members of a lodge who identify themselves by badges. When a State court has denied an asserted constitutional right, the State court cannot foreclose this Court from considering the federal claim merely by labelling absence of coercion a "fact." But if a State court, reading the record in the light of its intimate knowledge of local police and prosecutorial methods, should conclude that a confession was coerced, I cannot believe that this Court would set aside that appraisal and decide independently that the confession was wholly free and self-willed. It is not fortuitous that all the cases in which this Court has indicated that it was not foreclosed by the determination of the State court have been cases in which the State rejected the federal constitutional claim by finding the confession voluntary.

Since, as I believe, an affirmative determination of the California Supreme Court that the confession was coerced would not and should not be reexamined here, I would, on this aspect of the case, remand for that court to say whether or not, in its judgment and not as an assumption, the first confession was involuntary.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

My views on the illegality of confessions obtained between the time of arrest and arraignment are contained in *Watts* v. *Indiana,* 338 U. S. 49, 56–57; *Turner* v. *Pennsylvania,* 338 U. S. 62, 66–67; *Harris* v. *South Carolina,* 338 U. S. 68, 71–73. The practice of obtaining confes-

204

sions prior to arraignment breeds the third-degree and the inquisition. As long as it remains lawful for the police to hold persons incommunicado, coerced confessions will infect criminal trials in violation of the commands of due process of law.

The facts of this case illustrate the evils of this police practice. While the defendant was being held by the police prior to his arraignment, a lawyer tried to see him. The police refused the lawyer's repeated requests. It was only after a confession was obtained that the lawyer was allowed to talk with the prisoner. This was lawless conduct, condemned by the Supreme Court of California. It was not only lawless conduct; it was conduct that produced a confession.

This confession as well as subsequently obtained confessions were used at the trial. The fact that the later confessions may have been lawfully obtained or used is immaterial. For once an illegal confession infects the trial, the verdict of guilty must be set aside no matter how free of taint the other evidence may be. *Malinski* v. *New York,* 324 U. S. 401.

Moreover, the fact that the accused started talking shortly after he was arrested and prior to the time he was taken before the District Attorney does not save the case. That talk was accompanied or preceded by blows and kicks of the police; and the Supreme Court of California assumed that it was part and parcel of the first confession obtained through "physical abuse or psychological torture or a combination of the two."