State of Nebraska, appellee, v. Alex Reizenstein, appellant.

160 N. W. 2d 208

Filed July 12, 1968.    No. 36831.

Robert L. Gilbert, for appellant.

Clarence A. H. Meyer, Attorney General, and Harold Mosher, for appellee.

Heard before White, C. J., Carter, Spencer, Boslaugh, Smith, McCown, and Newton, JJ.

Newton, J.

On November 30, 1956, defendant's wife was fatally wounded with a shotgun. Defendant was taken into

custody immediately after the shooting and was subsequently charged with murder in the first degree in connection with the death of his wife. He was tried, convicted, and the conviction affirmed on appeal. See Reizenstein v. State, 165 Neb. 865, 87 N. W. 2d 560, and 166 Neb. 450, 89 N. W. 2d 265.

The present proceeding is one under the Post Conviction Act. Defendant was denied relief, after an evidentiary hearing, and has appealed. His assignments of error refer to certain exculpatory statements or admissions and present the following questions: (1) Were they voluntary? (2) Was there a judicial determination of voluntariness, and if not was error committed? (3) Was it error for the court to fail to submit the question of voluntariness to the jury?

"In a post conviction proceeding, petitioner has the burden of establishing a basis for relief." State v. Sagaser, 181 Neb. 329, 148 N. W. 2d 206. It is urged that defendant was mentally defective, that at the time he made the statements in question he was intoxicated and not responsible, that he was afraid of the officers questioning him, and that trickery was resorted to.

Defendant was questioned on the evening of the shooting after being taken into custody and removed to the county attorney's office. The pertinent statements made by him may be summarized. He admitted quarreling with his wife, getting a shotgun, and loading it. He said a scuffle ensued and that his wife was shot, but at all times insisted that he intended to use the gun to commit suicide, that he had no intention to shoot or kill his wife, did not pull the trigger, and did not know how the gun was discharged.

In determining the voluntariness of the foregoing statements the circumstances surrounding the event must be kept in mind. Two of defendant's children were in the house at the time. They were witnesses to the quarrel between defendant and his wife, saw him get and load the gun, and heard the shot. Immediately there-

after two police officers arrived and found the defendant, with the gun, bending over his wife as she lay on the floor. Defendant does not now and never has contended that any one else shot his wife. Under these circumstances it is apparent that defendant would have, and must have known that he would have, difficulty in satisfactorily explaining his actions except on the ground of an "accidental shooting." Obviously he could not successfully deny the shooting and his statement is entirely consistent with the "accident" theory which comprised one of the defenses presented at his trial. The statement presents the only logical noncriminal explanation of the occurrence other than a defense of insanity. On the face of it, it presents just such a voluntary explanation as any ordinary person might offer under similar circumstances.

That defendant was below normal intellectually was not disputed. One neuropsychiatrist classified him as a middle-grade moron, and the second that he was subject to a mild, mental retardation. It was conceded that he knew the difference between right and wrong, and was legally sane. On the evening when he was questioned he had been drinking and the evidence regarding whether or not he was intoxicated at that time was conflicting. He now states that he was "under pressure" because about a year earlier his wife had sent for the police and he was beaten about the head while resisting arrest. None of the officers involved in that incident were present when he was questioned, he was not threatened in any manner, but on the contrary was well acquainted with, and on a friendly basis with, several of the officers present. It is said that he was subjected to trickery in that he was asked, with reference to pulling the trigger, why his little 7-year-old son Randy said he did. Defendant's response was that he did not pull the trigger.

No threats or promises were made or any inducements offered. Do these circumstances warrant a finding by this court, in a post conviction proceeding, that

defendant's statements were involuntary? We think not. The alleged trickery, if such it is, was obviously unavailing and came about after the defendant had already made the statements now objected to. For the reasons mentioned above his contention that he was afraid of the officers is not entitled to credence. His mental retardation was not sufficient to prevent his successfully engaging in a minor contracting business wherein he employed a number of people to pick potatoes and paid for their labor, or to earn a living as a laborer in various pursuits. Nor was it such as to prevent his offering a reasonable theory of accidental shooting in explanation of what had occurred. Regarding the extent of his intoxication at the time of the shooting the jury found, under proper instructions, that he was not sufficiently intoxicated to prevent his forming a criminal intent. It was several hours after the shooting, and presumably when he was more sober, that he was questioned. The jury likewise found against defendant on the issue of insanity. He has not, in this proceeding, sustained the burden of proving that his statements were involuntary. See Johnson v. Commonwealth of Massachusetts, 390 U. S. 511, 88 S. Ct. 1155, 20 L. Ed. 2d 69.

The law of Nebraska in operation at the time of defendant's offense and trial did not require that he be warned that any statements he might make might be used against him as a necessary prerequisite to their admission in evidence. See, Holthus v. State, 138 Neb. 200, 292 N. W. 603; Bush v. State, 112 Neb. 384, 199 N. W. 792. It was sufficient if the statement was voluntarily made and not induced by threats or promises. Schlegel v. State, 143 Neb. 497, 10 N. W. 2d 264. Escobedo v. Illinois, 378 U. S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977, now requires that a defendant be warned of his right to remain silent; and Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A. L. R. 3d 974, which now places restraints on in-custody interrogations, were not then in effect and are not retroactive. See Johnson

v. New Jersey, 384 U. S. 719, 86 S. Ct. 1772, 16 L. Ed. 2d 882.

It is said that there was not a judicial determination of the voluntariness of defendant's statement. The record discloses that the trial court sustained several objections to the admission of this evidence. The objections were based on a lack of foundation and a failure to show that the statement was voluntarily made. On additional proof in this regard the evidence was admitted and the ruling of the court comprises a judicial finding of sufficient evidence to establish voluntariness.

Jackson v. Denno, 378 U. S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908, 1 A. L. R. 3d 1205, requires a determination by the court of the voluntariness of an admission or confession before it can be received in evidence. The court remanded the cause with orders to grant an evidentiary hearing to determine if the confession was voluntary, and stated if it was found to be voluntary a new trial was not necessary but should be granted if the confession was found to be involuntary. A similar procedure has been employed in the present instance.

The question of the voluntariness of defendant's statements was a primary issue at the evidentiary post conviction hearing. In denying defendant's prayer for relief the court necessarily found that the statements were voluntary.

Defendant complains that instruction No. 22 given by the court in the original trial was prejudicial to the defendant in that it advised the jury that defendant's statement was voluntary. The instruction is as follows: "You are instructed that the State, having introduced the admissions and declarations made by the defendant Alex Reizenstein, the truth of any exculpatory or mitigating facts embraced in the declarations or admissions so introduced would be presumed, unless their falsity was shown by the evidence in the case." This is an instruction requested by defendant and would appear to be a beneficial one from his standpoint. Neither this propo-

sition, nor the included complaint that the court failed to submit to the jury the question of whether or not the statement was voluntary may now be heard. Defendant at no time denied participation in the incidents leading to and resulting in the death of his wife. In view of the situation as it existed it was apparent that he could not successfully deny such participation. The admission of his statement was not prejudicial to him but constituted self-serving statements which substantiated his defense of "accidental shooting." The only other defenses urged were those of insanity and intoxication.

These issues might properly have been presented on the appeal from the original trial, but it is now too late for their consideration. "An application for a hearing under the Post Conviction Act is not a substitute for an appeal * * *." State v. Erving, 180 Neb. 680, 144 N. W. 2d 424.

In any event the foregoing factors do not present a constitutional issue. In Jackson v. Denno, *supra*, the court approved the final determination of the issue of voluntariness by the trial judge and indicated it was not necessary to submit such question to the jury. "In jurisdictions following the orthodox rule, under which the judge himself solely and finally determines the voluntariness of the confession, * * * the judge's conclusions are clearly evident from the record since he either admits the confession into evidence if it is voluntary or rejects it if involuntary." In the absence of a violation or infringement of a constitutional right no relief may be had under the Post Conviction Act. See, State v. Erving, *supra;* State v. Clingerman, 180 Neb. 344, 142 N. W. 2d 765.

Defendant also assigns as error the "knowing use of false evidence" by the state. This assignment is without merit. The first statement of the witness Lee Shipley which is complained of must be considered in context. Shipley quoted defendant as saying "that he did get the gun and that he did load it, and he said that he

didn't intend to kill his wife with it; that he intended to commit suicide, himself; that he done it to scare her— got the gun to scare her, but he intended to commit suicide, himself." Defendant's implication that the witness inferred defendant got the gun to threaten his wife is unfounded. The second assertion that Shipley misquoted defendant when he said defendant "didn't state whether he discharged it or not" (referring to the gun) is likewise unfounded. Defendant was quoted as saying on one occasion that his wife pulled the trigger, on another that "he didn't know how the gun went off," and again as repeatedly saying "he didn't know how the gun happened to be discharged." Obviously there was no attempt to knowingly use false testimony to imply that defendant did not know whether or not he discharged the gun or was evading the issue.

The appeal is without merit and the judgment is affirmed.

AFFIRMED.

McCOWN and SMITH, JJ., dissenting.

We respectfully dissent. The defendant's original trial was in April 1957. The basic facts are set out in Reizenstein v. State, 165 Neb. 865, 87 N. W. 2d 560. Some additional facts relevant here are reflected in the supplemental opinion in Reizenstein v. State, 166 Neb. 450, 89 N. W. 2d 265.

The shooting of defendant's wife occurred at their home sometime after 7 p.m. on November 30, 1956. The only persons in the room when the shooting occurred were the defendant and his wife. Their 7-year-old son and 12-year-old daughter were in the home at the time of the shooting and testified as to events before and just after the shooting. There was also evidence of statements by decedent admitted as part of the res gestae or as dying declarations. The defendant was arrested at the home at approximately 8 p.m., and was still in the room where the shooting occurred at the time of his arrest. The fundamental issue was whether the shoot-

ing occurred unintentionally in the course of a struggle or in an effort by the defendant to kill himself; or whether it was done purposely and maliciously but without deliberation and premeditation; or whether it was done purposely and of deliberate and premeditated malice.

The defendant's motion here centers around the constitutional issues involved in the admissibility and the method of admission in evidence of a statement made by the defendant on the same evening between 8:30 p.m. and approximately 10:40 p.m. The statement was in question and answer form and was taken at the county attorney's office in the courthouse and reported by the official court reporter except for a small portion taken by a stenographer before the reporter arrived. The statement was taken in the presence of the county attorney, the sheriff, the chief of police of the City of Scottsbluff, the assistant chief of police, a police officer, the stenographer, and the court reporter. The defendant was not represented by counsel nor given any warnings.

The defendant's physical and mental condition at the time are vital in assessing the totality of the circumstances. Defendant's 15-year-old son testified that the defendant was drunk when the son left the home at 6:30 or 6:45 p.m. Another witness testified that sometime in the afternoon the defendant was intoxicated and the witness would not talk to him. At the time the statement was taken, the testimony of the persons present indicated varying degrees of intoxication. The court reporter stated that he was drunk. The county sheriff described the defendant as being "in drunken daze." The secretary of the county attorney stated that: "He was in a daze" and "He was incoherent a little bit." The chief of police testified: "He had been drinking but he wasn't drunk." One of the police officers stated: "He had the appearance of a man that had been drinking; there was the odor of liquor on his breath, his face

was flushed, his eyes were watery and blurry" and that "taking the statement he was not too coherent, and just rambled on." It is quite apparent from the 69-page question and answer statement, that the defendant was in a state of emotional shock and more than once inquired as to whether or not his wife had died, and more than once expressed the desire to die himself if she were dead. His wife died in the hospital at 10:40 p.m., at approximately the time the statement was completed.

There is no dispute but that the defendant was mentally retarded. Dr. Farrell, a neuropsychiatrist, testified at the trial that the defendant was mentally retarded; that he had a mental age somewhere between 7 and 8 as compared to 12 to 14 years for normal adults, and that he would classify him as a middle-grade moron. Dr. Krush, a psychiatrist, testified for the State that the defendant had a full scale I.Q. of 76 which, under his classification, would be mild mental retardation. Both psychiatrists testified that the defendant knew the difference between right and wrong, or that he was legally sane. The defendant in his deposition at the penitentiary, testified that he had spent 4 or 5 years in the first grade; 3 or 4 years in the second; and passed to the third grade and quit school when he was 15 years of age.

The county attorney, the chief of police, the assistant chief of police, a police officer, and the sheriff all participated at one time or another in the questioning. Throughout the questioning, the defendant continuously insisted that he did not pull the trigger. He repeatedly said that he did not know how it happened or that there was a scuffle between himself and his wife and he didn't know how the gun went off. In the course of the interrogation, the defendant complained that other police officers, at an unrelated and unspecified prior time, had used a blackjack on him. Toward the end of the questioning, the defendant was told: "That's too bad. You know, there's a hard way and an easy way.

For goodness sakes, get it off your chest while you are doing it and get it done." Later: "Well, you have known me a long time, and there is a hard way and an easy way to get along with these boys." The defendant's answer was: "I know, but I didn't do it, Steve, and I didn't shoot her and I'll say that and I'll keep saying it. I didn't." It was also indicated to defendant that his son and other witnesses had said the defendant pulled the trigger. The use of psychological pressure and the undeviating intent of the officers to obtain a confession, if a confession was obtainable, are apparent.

The constitutional issues involved in the admissibility of a statement made by a defendant as the result of in-custody interrogation are further complicated here. The statement itself was never admitted in evidence. Instead, two police officers testified, summarizing their recollection of portions of the statement. Before the commencement of the trial, the defendant filed a motion for an order requesting the county attorney to produce for inspection written statements taken in short-hand to enable counsel to determine what the mental condition of the defendant was at the time the statements were made. On the hearing on the motion, the county attorney was called as a witness and objected to testifying. His right to refuse to testify and to refuse to submit the statement for inspection was sustained. At the trial, certain of the witnesses who had been present when the statement of the defendant was taken were called on behalf of the State. Two of them testified as to the statement made by the defendant. The principal witness was the assistant chief of police, Lee Shipley. The witnesses had refreshed their recollections from the question and answer statement. Defendant's counsel requested the production of the statement for purposes of cross-examination at the time. The request was denied. The defendant's counsel objected to the introduction of Mr. Shipley's testimony as to his recollection of the statement at least three times prior

to the court's overruling of the objections. The objections were based, among other things, on the ground that the statements or admissions had not been shown to be voluntary admissions nor that the defendant had capacity to make the admissions at that time. These objections were overruled. The defendant later called the reporter who took the statement and attempted to get the statement or shorthand notes containing the statement into evidence. Objection was made and sustained. The court later ordered the preparation and production of a transcript of the notes as a substitute for the notes, but the defendant's counsel did not have a transcribed copy until after the trial. At the trial, Mr. Shipley's testimony as to the statement requires two and a half pages in the record. The statement itself was contained in 69 pages. Mr. Shipley's summarized recollection of the statement did not reflect the physical condition of the defendant nor his mental nor emotional state at the time, nor the fact that he was "not too coherent, and just rambled on."

In some respects, Mr. Shipley's recollection and testimony was clearly faulty. He testified that the defendant had said: "That he done it to scare her—got the gun to scare her." A complete examination of the question and answer statement shows that it did not contain any such statement. Mr. Shipley also testified: "He was asked if he didn't bend over and make the statement to her that he was sorry for what he had done. His answer to that question was, 'You're darn right I did.'" As a matter of fact, the question actually asked was a double question and was repeated three times in essentially the same language. The record shows: "Q. Alex, just before I came there, didn't you tell your wife not to die; you were sorry for what you had done? A. You're darn right I did. Q. What? A. I don't want her to die. Yes. Q. You told her you didn't want her to die; you were sorry for what you did? A. I wanted her to live. I love her. Q. I just asked you if you told

her you didn't want her to die; that you were sorry for what you did. A. You're darn right I didn't want her to die because I didn't shoot her. I don't know how it happened."

Mr. Shipley, in his summarization of the statement, while he testified that the defendant had said that he didn't know how the gun happened to be discharged, specifically testified also: "He didn't state whether he discharged it or not." The actual question and answer statement is replete throughout with specific denials from the defendant that he ever pulled the trigger or discharged the gun.

At the time of the trial here, neither Escobedo v. Illinois, 378 U. S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977, nor Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694. 10 A. L. R. 3d 974, were then anything more than a vague possibility on the judicial horizon. Consequently, the determination of the voluntariness of a confession is to be judged by the totality of the circumstances in which the failure to give warnings is only one aspect. See, Johnson v. New Jersey, 384 U. S. 719, 86 S. Ct. 1772, 16 L. Ed. 2d 882. See, also, Haynes v. Washington, 373 U. S. 503, 83 S. Ct. 1336, 10 L. Ed. 2d 513.

In Blackburn v. Alabama, 361 U. S. 199, 80 S. Ct. 274, 4 L. Ed. 2d 242, the determination of whether a confession is voluntary was measured by whether it was the product of a rational intellect and a free will. In Lisenba v. California, 314 U. S. 219, 62 S. Ct. 280, 86 L. Ed. 166, it was established that the Fourteenth Amendment forbids fundamental unfairness in the use of evidence whether true or false. In determining the totality of the circumstances, the factual matters already discussed are unquestionably attendant circumstances which the accused is entitled to have appropriately considered in determining the voluntariness and admissibility of his confession. See, Culombe v. Connecticut, 367 U. S. 568, 81 S. Ct. 1860. 6 L. Ed. 2d 1037; Townsend v. Sain, 372 U. S. 293, 83 S. Ct. 745, 9 L. Ed. 2d 770; Spano

v. New York, 360 U. S. 315, 79 S. Ct. 1202, 3 L. Ed. 2d 1265.

An altered or prejudicially inaccurate version of a defendant's statement, regardless of the cause of the distortion, raises serious questions as to whether the statement as introduced in evidence can be said to be the product of the defendant's free will and intellect. The due process clause of the Fourteenth Amendment forbids fundamental unfairness in the use of evidence whether true or false. See Blackburn v. Alabama, *supra.*

The record shows that the district court at the time of the original trial, made no separate judicial determination outside the presence of the jury as to the voluntariness of the statements made by the defendant. The county attorney, in argument on the objections to admission of the summarized statement, took the position that the statements were in the nature of admissions and not a technical confession, and that it was not necessary to show any further foundation as to whether they were voluntary.

Constitutional rights or tests for admissibility of a defendant's in-custody statements do not depend on technical distinctions between confessions, admissions, or statements. This is obvious where the statement tends to establish an essential fact or element necessary to prove guilt.

On the initial appeal to this court, the direct issue of voluntariness was not considered. This court said with respect to the statement: "It does not appear necessary to summarize the testimony since it is not contended that the information was not admissible but only that the method of disclosing it to the jury was improper."

In Jackson v. Denno, 378 U. S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908, 1 A. L. R. 3d 1205, the Supreme Court said: "It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involun-

tary confession, without regard for the truth or falsity of the confession, Rogers v. Richmond, 365 U. S. 534, and even though there is ample evidence aside from the confession to support the conviction. Malinski v. New York, 324 U. S. 401; Stroble v. California, 343 U. S. 181; Payne v. Arkansas, 356 U. S. 560. Equally clear is the defendant's constitutional right at some stage in the proceedings to object to the use, of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession."

The court also stated: "A defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined."

The principle set out in Jackson v. Denno, *supra,* has long been followed in this state. See, Gallegos v. State, 152 Neb. 831, 43 N. W. 2d 1; State v. Longmore, 178 Neb. 509, 134 N. W. 2d 66. In the latter case, we also reaffirmed the principles of Parker v. State, 164 Neb. 614, 83 N. W. 2d 347. "In a criminal trial a confession of guilt alleged to have been made by the defendant is not competent in evidence, unless first shown to have been voluntarily made. * * * If the court determines as a matter of law that no sufficient foundation has been laid, then the confession should be rejected, but where the confession is received in evidence, its voluntary character is still a question of fact for the, jury."

At the original trial here, not only did the trial court fail to determine on evidence taken out of the presence of the jury whether or not it had been sufficiently shown that the statement was voluntarily made, but the issue of voluntariness was not even submitted to the jury for its determination. The only instruction pertaining to the statement read: "You are instructed that the State, having introduced the admissions and declarations made by the defendant Alex Reizenstein, the truth of any ex-

culpatory or mitigating facts embraced in the declarations or admissions so introduced would be presumed, unless their falsity was shown by the evidence in the case."

This instruction only compounded the failure of the court to instruct on the issue of voluntariness and effectively withdrew the issue of voluntariness from the consideration of the jury. The voluntariness of a confession or admission made in the course of in-custody interrogation is an essential fact issue which, under our procedure, must first be determined by the court, and if received in evidence, must also be submitted to the jury. See Parker v. State, *supra.*

A defendant has a constitutional right to a fair hearing and a reliable determination of the voluntariness of a confession not influenced by its truth or falsity. Jackson v. Denno, *supra.*

The error here which possibly influenced the jury adversely cannot be conceived of as harmless. Even if it be assumed that the error here might be subject to the harmless constitutional error rule of Chapman v. California, 386 U. S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, it is impossible to satisfy ourselves beyond a reasonable doubt that the error did not contribute to the defendant's conviction. To say the least, it constituted an inseparable part of the evidence which supported his conviction for first degree murder as opposed to a lesser degree of homicide.

The proceedings here reveal the absence of the fundamental fairness essential to our concept of justice sufficient to constitute a denial of due process of law, whether we ignore retroactive constitutional decisions subsequent to 1957 or not. The totality of the relevant circumstances here compels the conclusion that the defendant's statement was involuntary and constitutionally inadmissible. The conviction and sentence should have been vacated, and the cause remanded for such further

proceedings as the county attorney of Scotts Bluff County might determine appropriate.