**UNITED STATES of America**

v.

**Stephen FLEMMI**

**No. 94–10287 MLW.**

United States District Court, D. Massachusetts.

Feb. 24, 2000.

Richard M. Egbert, Law Office of Richard Egbert, Kenneth J. Fishman, Fishman, Ankner & Horstman, LLP, Kimberly Homan, Boston, MA, for Defendant.

Fred M. Wyshak, Jr., Brian T. Kelly, United States Attorney's Office Boston, MA, James D. Herbert, U.S. Attorney's Office Boston, MA, John Durham, U.S. Attorneys Office, Boston, MA, Richard L. Hoffman, United States Attorney's Office, Boston, MA, for U.S.

## MEMORANDUM AND ORDER

WOLF, District Judge.

On January 28, 2000 defendant Stephen Flemmi filed a Motion to Dismiss and/or for Sanctions for Violations of Federal Rule of Criminal Procedure 6(e) ("Rule 6(e)") and Rule 83.2A of the Local Rules of the United States District Court for the District of Massachusetts (the "Motion"). The Motion is based on a series of newspaper articles, dating back to July 1998, which allegedly reveal matters occurring before one or more grand juries which have continued to investigate Flemmi since his indictment in this case in 1995. The articles also describe other matters prejudicial to Flemmi which are reportedly being discovered in the ongoing investigation of him. For example, as detailed below, the articles report, among other things, that Kevin Weeks, an indicted associate of Flemmi's, led investigators to the graves of two men and a woman that Flemmi had participated in murdering; the woman had been seduced by Flemmi when she was a teenager and killed years later when she threatened to tell her mother, with whom Flemmi was living; and this matter was representative of Flemmi's penchant for young women, at least one other of whom may also have been murdered by him. See, e.g., Ex. 5 hereto.

On February 11, 2000 the government filed its opposition to the Motion. In that opposition, the government represented

that it "shares the defendant's concerns about the extent of the recent publicity" regarding its continuing investigation of Flemmi and others. Gov. Opp'n at 1.

With its opposition, the government submitted affidavits from United States Attorney Donald Stern and nine other prosecutors. On February 18, 2000, the government filed additional affidavits from the investigators working with prosecutors in connection with the grand jury investigation being led by Department of Justice Attorney John Durham.[1] Each of the affiants asserts that he or she did not disclose, or authorize the disclosure of, information the media has reported is being provided by several individuals said to be cooperating with the government. Nor, the affiants represent, did any of them provide to the media the Federal Bureau of Investigation ("FBI") 302 reports of witness interviews referenced in published articles. At least one of those reports was produced in discovery in this case and is subject to a protective order, issued on June 26, 1997, that prohibits its disclosure to the media, among others (the "Protective Order"). *See United States v. Salemme*, 978 F.Supp. 386, 390 (D.Mass. 1997). The information contained in that report was also discussed in a sealed, November 14, 1997 Order and in several conferences that were closed to the public.

The government affiants do not assert that they did not furnish the media with *any* of the information about which Flemmi complains. Rather, their affidavits address only the issues of the disclosure of information attributed to certain purported sources and several specified documents. Moreover, the government has not filed affidavits from law enforcement personnel who have obligations, described below, in addition to those imposed by Rule 6(e), not to release information that creates a danger of prejudice to a defendant's right to a fair trial. In addition, the affidavits submitted describe no effort by the government to determine whether improper disclosures to the media have been made by government personnel.

A hearing on the Motion was held on February 15, 2000. At the hearing, the prosecutors confirmed that, despite its concern about the recent publicity, the Department of Justice initiated no investigation regarding the possible improper disclosure of information by government personnel prior to the filing of the Motion on January 28, 2000. Feb. 15, 2000 Tr. at 5, 67. Nor does it appear that the government has conducted any such investigation since the filing of the Motion. The court was informed on February 15, 2000, however, that the United States Attorney is now requesting that the Department of Justice Office of Professional Responsibility conduct at least a civil investigation. *Id.*

As counsel for Flemmi pointed out, the government's inaction to date in this matter differs from its conduct when it has suspected that defendants or their counsel had violated the Protective Order restricting the disclosure of documents and information produced by the government in discovery in this case. In 1997, the government quickly conducted an investigation of an apparent violation of the Protective Order. As a result, this court promptly commenced a trial to determine whether to hold counsel for Flemmi's co-defendant, Francis Salemme, in criminal contempt. *See United States v. Salemme* (Sept. 15, 1999, Clerical Corrections Dec.

---

1. As discussed below, it appears that Flemmi may also be the subject of ongoing investigation by the grand jury which indicted Kevin Weeks and Kevin O'Neill. If there is such an investigation, affidavits have not been submitted by the attorneys and investigators with knowledge of the matters occurring before the grand jury.

23, 1999) at 434 n.65. In addition, with the approval of the court, the government has conducted a grand jury investigation of whether Salemme and codefendant Robert DeLuca have violated the Protective Order. As Salemme and DeLuca have been informed, their guilty pleas in the instant case have not extinguished the possibility that the court will conduct proceedings to determine whether they should be found guilty of criminal contempt and sentenced for violating the Protective Order.

As set forth below, Flemmi has presented a *prima facie* case that the government has violated Rule 6(e), and other relevant rules, regulations, and orders relating to pretrial publicity. Thus, the government is being ordered to respond further to Flemmi's request for sanctions. *See In re Sealed Case No. 98–3077*, 151 F.3d 1059, 1067–68 (D.C.Cir.1998).

Flemmi is now a defendant in this case and two others pending in this District Court, *United States v. Flemmi*, Cr. No. 97–10060–REK, and *United States v. Connolly, et al.*, Cr. No. 99–10428–JLT. The court understands that Flemmi is also the subject of at least one continuing grand jury inquiry and other investigation which may lead to another case against him and/or additional charges against Flemmi being alleged in a Superceding Indictment in a pending case. *See* Sept. 15, 1995 Tr. (Under Seal) at 34; "U.S. judge withdraws from case," *The Boston Globe* (Dec. 21, 1999) ("Prosecutors told [Judge] Harrington that it is possible that a superceding indictment will be handed down [in *United States v. Kevin J. Weeks and Kevin F. O'Neill*, Cr. No. 99–10371] adding more defendants and charges to the case

against Weeks and O'Neill.")[2] In view of Flemmi's hybrid status as both an indicted defendant and the subject of continuing investigation, it is at this point most appropriate to permit the government to make certain filings, at least initially, *ex parte* and under seal for the court's *in camera* consideration in order to maintain the confidentiality of any pending grand jury or other investigation of Flemmi. *See In re Sealed Case No. 98–3077*, 151 F.3d at 1073.

The Motion implicates several rules, regulations, and orders which are intended, in whole or in part, to protect a defendant's right to a fair trial, untainted by prejudicial information that is not presented in court. Those requirements serve vital interests. As Justice Oliver Wendell Holmes wrote, "[t]he theory of our system is that conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether private talk or public print." *Patterson v. Colorado ex rel. Attorney General*, 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879 (1907). Thus, as Justice Felix Frankfurter noted:

> [t]o have the [government] feed the press with evidence . . . is to make the State itself . . . a conscious participant in trial by newspaper, instead of by those methods which centuries of experience have shown to be indispensable to the fair administration of justice.

*Stroble v. California*, 343 U.S. 181, 201, 72 S.Ct. 599, 96 L.Ed. 872 (1952) (Frankfurter, J. dissenting).

Rule 6(e)(2) prohibits a government attorney, or any government employee as-

---

2. The indictment of Weeks and O'Neill is replete with references to alleged criminal conduct by Flemmi. *See* Indictment, Cr. No. 99–10371. Moreover, the Redacted Affidavit of Thomas B. Duffy in Support of Pretrial Detention of Defendants Kevin J. Weeks and Kevin P. O'Neill was evidently drafted, in part, in

anticipation of Flemmi's indictment in that case. For example, in paragraph 24 Duffy states: "In my professional opinion, if Flemmi were freed from custody, violence likely would result between Bulger, Flemmi and their associates and persons allied or associated with the LCN."

sisting that attorney, from disclosing "matters occurring before the grand jury." Rule 6(e)(3)(b) requires that a government attorney:

promptly provide the district court, before which was empaneled the grand jury whose material has been [disclosed to federal state or local personnel], with the names of the persons to whom such disclosure has been made, and shall certify that the attorney has advised such persons of their obligation of secrecy under this rule.

See also In re Sealed Case No. 98–3077, 151 F.3d at 1076 n. 18.

As the Court of Appeals for the District of Columbia wrote in addressing issues arising out of the Independent Counsel's investigation of President Clinton, the phrase "matters occurring before the grand jury":

encompasses "not only what has occurred and what is occurring, but also what is likely to occur," including "the identities of witnesses or jurors, the substance of testimony as well as actual transcripts, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like."

In re Sealed Case No. 99–3091, 192 F.3d 995, 1001 (D.C.Cir.1999) (quoting In re Motions of Dow Jones & Co., 142 F.3d 496, 500 (D.C.Cir.), cert. denied, 525 U.S. 828, 119 S.Ct. 60, 142 L.Ed.2d 47 (1998)). Rule 6(e) has been interpreted as covering matters "likely to occur" to prevent government officials from subverting the Rule by discussing testimony about to be presented to the grand jury, or disclosing the strategy and direction of an investigation in a manner which refers to testimony that is clearly anticipated. Id. at 1002–03. See also In Re Grand Jury Investigation, 610 F.2d 202, 216–17 & n. 4 (5th Cir.1980) ("Lance"); In re Grand Jury Subpoena, 103 F.3d 234, 238 (2d Cir.1996).

The United States District Court for the District of Massachusetts has promulgated Local Rule 83.2A, captioned "Release of Information by Attorneys," to supplement Fed.R.Crim.P. 6(e). Local Rule 83.2A prohibits an attorney from making any extrajudicial statement that he or she should expect will be publicly reported about, among other things, the "character or reputation of the accused," "[t]he performance of any examinations or tests," or his or her opinion of "the evidence in the case." Local Rule 83.2A represents part of this District Court's response to the Supreme Court's direction that:

The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for the defense, the accused, witnesses, court staff nor law enforcement officers coming under the jurisdiction of the court should be allowed to frustrate its function.

Sheppard v. Maxwell, 384 U.S. 333, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). See also Levine v. United States Dist. Court for the Cent. Dist. of California, 764 F.2d 590, 596 (9th Cir.1985).

As the Supreme Court observed in Sheppard, improper disclosures by law enforcement officers, as well as by attorneys for the government, threaten the integrity of judicial proceedings. Sheppard, 384 U.S. at 363, 86 S.Ct. 1507. Therefore, a court may regulate the conduct of law enforcement officers involved in a case before it. Id. The degree to which Local Rule 82.2A applies to the conduct of law enforcement officers may be debatable. At the February 15, 2000 hearing the government acknowledged that the Local Rule applies at least to a law enforcement officer acting at the direction of a prosecutor. Feb. 15, 2000 Tr. at 77. In any event, the court has the power to issue an order

restricting the comments of agents as well as attorneys. *See* Local Rule 83.2B, "Special Orders for the Protection of the Accused or the Litigants in Widely Publicized or Sensational Criminal or Civil Cases";[3] *Levine*, 764 F.2d at 596; *In re Sealed Case No. 98–3077*, 151 F.3d at 1068.

In addition, the Department of Justice has promulgated a regulation which expressly governs the release of information by *all* personnel of the Department of Justice. *See* 28 C.F.R. § 50.2.[4] That regulation states, in part, that:

> (6) The release of certain types of information generally tends to create dangers of prejudice without serving a significant law enforcement function. Therefore, personnel of the Department should refrain from making available the following:
>
> (i) Observations about a defendant's character.
>
> \* \* \* \* \* \*
>
> (iii) Reference to investigative procedures such as ... laboratory tests ...
> (iv) Statements concerning the identity, testimony, or credibility of prospective witnesses.
> (v) Statements concerning evidence or argument in the case, whether or not it is anticipated that such evidence or argument will be used at trial.
>
> \* \* \* \* \* \*

*Id.*

At the February 15, 2000 hearing, the government expressed the tentative view

that 28 C.F.R. § 50.2 is not judicially enforceable. Feb. 15, 2000 Tr. at 4. This may not be correct. It has been held that provisions of an agency's *internal manual* have no legal force. *See Schweiker v. Hansen*, 450 U.S. 785, 789, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (the Social Security Administration's "Claims Manual is not a regulation. It has no legal force, and it does not bind the [agency]"); *United States v. Caceres*, 440 U.S. 741, 744–54, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979) (Internal Revenue Service Manual provisions concerning procedures to be followed to obtain agency approval to record conversations consensually are not mandated by the Constitution or federal law and, therefore, are not judicially enforceable); *Kugel v. United States*, 947 F.2d 1504, 1507–08 (D.C.Cir.1991) (Attorney General's Guidelines on Criminal Investigations are part of an intra-office manual and, unlike official regulations, have no legal force.). Twenty-eight C.F.R. § 50.2, however, is a promulgated and published official regulation, rather than a standard that is merely included in an internal manual. Thus, it may create rights which Flemmi, and others similarly situated, may enforce in court—an issue that the government is being afforded an opportunity to brief.

Finally with regard to the relevant standards, the Protective Order provides that the documents produced in discovery in this case, and the information that they contain, may be disclosed only to the defendants, counsel for the government and

---

3. Local Rule 83.2B provides that:

   In a widely publicized or sensational criminal or civil case, the court, on motion of either party or on its own motion, may issue a special order governing such matters as extrajudicial statements by parties and witnesses likely to interfere with the rights of the accused or the litigants to a fair trial by an impartial jury, the seating and conduct in the courtroom of spectators and news media representatives, the man-

agement and sequestration of jurors and witnesses, and any other matters which the court may deem appropriate for inclusion in such an order.

4. The court has been informed that the continuing investigation of Flemmi involves federal personnel, and state and local law enforcement agents, some of whom have been cross-designated as federal agents. Feb. 15, 2000 Tr. at 8–9.

the defendants and those assisting them, and may be used only for the purpose of litigating this case. *See Salemme,* 978 F.Supp. at 389–90.[5] These restrictions also apply to documents filed under seal and to closed proceedings concerning matters subject to the Protective Order. It was the apparent violation of the Protective Order that prompted the criminal contempt proceedings concerning Salemme's attorney described earlier.

The Court of Appeals for the District of Columbia recently discussed in detail the scope and nature of proceedings to enforce the confidentiality requirements of Rule 6(e)(2) when issues arise during the course of a grand jury investigation. *In re Sealed Case No. 98–3077,* 151 F.3d at 1067–77. Those standards and procedures also provide an appropriate framework for addressing the alleged violations in the instant matter of Local Rule 83.2A, the Protective Order, and 28 C.F.R. § 50.2.

In essence, if a defendant presents a *prima facie* case of a violation of Rule 6(e)(2), or another rule, regulation or order intended to prevent prejudicial pretrial publicity, the court must conduct a "show cause" hearing to determine whether the government has engaged in misconduct. *Id.* (citing *Barry v. United States,* 865 F.2d 1317, 1321 (D.C.Cir.1989)); *Levine,* 764 F.2d at 596 ("the *Sheppard* Court unequivocally imposed a duty on trial courts to take affirmative steps to insure the fairness of a criminal proceeding in the face of excessive publicity.").

The moving party's burden of establishing a *prima facie* case is relatively light. *In re Sealed Case No. 98–3077* 151 F.3d at 1068 n. 7. The determination is typically based solely on an assessment of news articles. *Id.* at 1067.

> The articles submitted need only be susceptible to an interpretation that the information reported was furnished by an attorney or agent of the government; in fact, "[i]t is not necessary for an article to expressly implicate [the government] as the source of the disclosures if the nature of the information disclosed furnishes the connection."

*Id.* at 1068, n. 7 (quoting *Barry,* 865 F.2d at 1325); *see also Lance,* 610 F.2d at 218.

██ In the instant case, Flemmi has presented a *prima facie* case that government attorneys and/or agents have violated Rule 6(e), Local Rule 83.2A, 28 C.F.R. § 50.2, and the Protective Order. Although the Motion is based on numerous published articles, which together form the basis of this conclusion, ten articles entered as exhibits at the February 15, 2000 hearing and attached hereto are particularly pertinent. The government has acknowledged that each of them is susceptible to the interpretation that a government attorney and/or agent was at least one source of the information reported. Feb. 15, 2000 Tr. at 58, 62.

For example, on September 25, 1998, *The Boston Herald* reported that: "One source familiar with [the grand jury investigation] said at least a half-dozen subpoenas had already been issued to current and former FBI agents." Ex. 1. The issuance of a grand jury subpoena is a matter governed by Rule 6(e). That is why motions to quash such subpoenas are typically addressed in proceedings that are closed to the public. *See In re Grand Jury Subpoe-*

---

5. On December 29, 1997, the court modified the Protective Order to permit documents subject to it to be shown to prospective witnesses and their counsel who agreed to be bound by the Protective Order. *See United States v. Salemme,* 1997 WL 810057 *4–5 (D.Mass. Dec. 29, 1997). The government has represented that no prospective witness was given a copy of any FBI report covered by the Protective Order. Feb. 15, 2000 Tr. at 89–90.

*na*, 103 F.3d at 238; Advisory Committee Notes to the 1983 Amendment to Rule 6. The report that at least six grand jury subpoenas had been issued to current and former FBI agents is susceptible to the interpretation that the information came from a government source familiar with the full range of the grand jury's activities. This interpretation is reinforced by another portion of the article, which reports that, "[s]ources also said Durham is looking closely at controversial former Special Agent H. Paul Rico." Ex. 1.

■ The court recognizes that, as the government argues, defense counsel are at times able to monitor grand jury investigations by getting reports from cooperative witnesses, who are not restricted by Rule 6(e). *See* Feb. 15, 2000 Tr. at 50–1. Thus, the mere presentation of a *prima facie* case cannot properly end the inquiry. However, when, as here, an article is susceptible to the reasonable interpretation that the information reported was furnished by an attorney or agent of the government, the court must require the government to show cause why it should not be held responsible for the publicity concerning the grand jury's proceedings. *In re Sealed Case No. 98–3077*, 151 F.3d at 1067; *Barry*, 865 F.2d at 1321.

The foregoing analysis is equally applicable to the articles attached hereto as Exhibits 2, 4 and 8. On October 11, 1999, *The Boston Globe* reported that:

Retired FBI Agent Roderick Kennedy, who interviewed [John] McIntyre in the fall of 1984, was called before the grand jury during the summer and asked whether he had ever told Connolly that McIntyre was cooperating against [Bulger and Flemmi], according to sources. Kennedy insists that he never told Connolly that McIntyre had implicated Bulger and Flemmi in the gun-running case, but knows that Connolly was aware of it at the time, sources said.

Ex. 2. The references to multiple sources for the information reportedly provided to the grand jury suggests that at least one of them may have been a government agent or attorney.

On January 14, 1999, *The Boston Globe* reported that:

Reputed Mafia boss Francis "Cadillac Frank" Salemme testified against Connolly, Flemmi, and Bulger before a federal grand jury according to the sources.

Ex. 4. This statement was made in an article which reports that three, specified law enforcement agencies had, according to "sources," spent the previous evening digging for the remains of John McIntyre and Arthur "Bucky" Barrett, and describes a search of Flemmi's mother's home. *Id.* Once again, read in context, the quoted statement is susceptible to the reasonable interpretation that at least one of the sources of the report concerning Salemme's alleged grand jury testimony was a government attorney or agent.

In addition, on January 20, 2000, *The Boston Herald* reported that:

A federal grand jury is probing a series of real estate transactions by former FBI agent John J. Connolly as part of an ongoing investigation into corruption and criminal wrongdoing in the FBI's Boston office.

Sources confirmed yesterday that the grand jury being run in Worcester by Assistant U.S. Attorney John Durham subpoenaed Connolly's real estate records in April. The subpoena sought records from Connolly's purchase and sale of a house on Thomas Park in South Boston, as well as records involving a vacation home in Chatham sources said.

\*     \*     \*     \*     \*     \*

Meanwhile, sources said federal investigators also subpoenaed Connolly's expense account records from his employ-

er, Boston Edison, where he has worked as a lobbyist since 1990.

Ex. 8. Once again, the range of information concerning the grand jury's investigation suggests that at least one of the sources may have been an individual covered by Rule 6(e).

The court recognizes that none of the articles describing the activities of the grand jury investigation expressly states that any or all of the sources were government attorneys or law enforcement agents. If they did, the authors would have unambiguously revealed that a violation of Rule 6(e) had occurred and, in the process, discouraged past and potential sources from providing additional information. However, other articles by the same reporters, some of which are discussed below, explicitly rely on law enforcement sources. As in *Barry*, "this record contains a 'whole spectrum of news articles' and '[t]he precise attribution of a source in one . . . may give definition to a vague source reference in others because of their context in time or content.'" *Barry*, 865 F.2d at 1326 (quoting *Lance*, 610 F.2d at 219). Read in the context of all of the other relevant articles, each of the foregoing exhibits is susceptible to the reasonable interpretation that the information reported concerning the grand jury's activities was provided, at least in part, by an attorney or agent of the government. Thus, it is necessary and appropriate to require that the government seek to negate the inference that Rule 6(e) has been violated.

In addition, several articles describe information reportedly being provided to the government by Kevin Weeks, an indicted, alleged associate of Flemmi's. Exs. 3, 5, 10. To the extent that the reports are accurate, common sense suggests that Weeks is likely to testify before a grand jury concerning the same matters. Thus, disclosure to the media, by a government attorney or agent, of information that Weeks is providing may constitute a violation of Rule 6(e). *In re Sealed Case, 99–3091,* 192 F.3d at 1001–03; *Lance,* 610 F.2d at 216–17; *In re Grand Jury Subpoena,* 103 F.3d at 238. Moreover, a *prima facie* showing has been made that certain statements in the articles referring to Weeks violate the prohibitions in Local Rule 83.2A and 28 C.F.R. § 50.2 against commenting on a defendant's character or reputation, or the evidence in the case.

Two articles particularly illustrate these points. Ex. 5, 10. On January 16, 2000, *The Boston Globe* published an article, headlined, "A sinister new chapter in mobsters' story." Ex. 5. The article reports that Weeks, "a trusted aide" to Flemmi and Bulger, led investigators to a Dorchester grave where two men and a woman allegedly killed by Bulger and Flemmi were buried. *Id.* According to the article, "sources said [Weeks] is cooperating with authorities." If true, this is a fact which would ordinarily be reliably known only by Weeks, his attorney, and the government attorneys and law enforcement agents working with them. *Id.* It is not a matter that Weeks or his attorney would want publicized.

The article goes on to report that:

[Weeks] has said the female victim is Deborah Hussey, who was 26 when she disappeared in the fall of 1984, and the daughter of the woman Flemmi lived with for many years. The allegation that Bulger and Flemmi or both may have been involved in the murder of a woman is no surprise to law enforcement authorities, who say the pair have a history of seducing, then mistreating, women.

Flemmi, law enforcement sources said, has long been a suspect in the disappearance of Hussey and his former girlfriend, Debra Davis, who was also 26 when she vanished on Sept. 17, 1981.

Bulger and Flemmi "had a thing for young girls," one of those sources said. "Both Stevie and Jimmy have a reputation with young women to the point that it was well known in South Boston that you had to lock up your younger sister when they were around."

Hussey had allegedly been having sexual relations with Flemmi since she was a teenager, and was threatening to expose the relationship to her mother, sources said. Flemmi shared his Milton home with Marion Hussey and helped her raise her two daughters and two sons from an earlier marriage.

"The consensus of opinion is that he was scared because she was so young when it started," said one law enforcement source.

Digging through the night in Thursday's bitter cold, officials from the State Police, federal Drug Enforcement Administration, Internal Revenue Service, Boston Police, and Suffolk County Medical Examiner's office unearthed the remains in a gully along the Southeast Expressway across from Florian Hall.

Officials said they could not positively identify the victims until DNA testing is complete. The process could take up to two months, officials said.

But sources said Weeks led them to the burial site and identified the dead as Hussey, Arthur "Bucky" Barrett, and John McIntyre.

Bulger and Flemmi have long been suspects in the murder of Barrett, one of six men charged in the $1.5 million Depositors Trust Bank heist in Medford in 1980, and McIntyre, suspected of cooperating against Bulger in an ill-fated plot to run guns to the Irish Republican Army. Barrett disappeared in 1983 and McIntyre vanished in 1984.

Weeks, who has been described as Bulger's "surrogate son," has reportedly turned on Bulger since his own indict-

ment on federal racketeering charges in November.

Weeks' cooperation is likely to lead to more charges against Bulger and Flemmi, who currently face two racketeering indictments, one returned in January 1995 and the other handed up last month.

*Id.*

Similarly, on January 26, 2000, *The Boston Globe* reported that "sources familiar with the investigation" reported that Weeks had identified the cellar of the former home of Bulger associate Pat Nee as the place where McIntyre, and possibly others, had been killed. Ex. 10. In addition, it was reported that "sources said Weeks claims the [three dead bodies discovered in Dorchester] are Arthur 'Bucky' Barrett, John McIntyre and Deborah Hussey." *Id.* The article also reported that:

Investigators said they believe [McIntyre] was killed because word was leaked Bulger was cooperating with authorities and had admitted his role in an ill-fated Bulger-sponsored operation to smuggle 7 tons of weapons to the Irish Republican Army aboard the Gloucester fishing trawler Vallhalla.

*Id.*

The nature of the foregoing articles, and the degree of detail concerning the investigation that they include, strongly suggests that agents and/or attorneys participating in the investigation furnished at least some of the information reported, in violation of Local Rule 83.2A, 28 C.F.R. § 50.2, and, possibly, Rule 6(e).

If derived, in whole or in part, from government sources, the revelations concerning McIntyre are anomalous as well as improper. As described in the September 15, 1999 Memorandum and Order, in violation of this court's Orders, the government failed to produce in time for key witnesses

to be questioned documents relating to the issues of whether Brian Halloran and/or McIntyre were killed because agents of the FBI told Bulger and Flemmi that they were cooperating with the FBI, and providing information concerning Bulger and Flemmi's criminal activity. Sept. 15, 1999 Memorandum and Order, Clerical Corrections Dec. 23, 1999, at 18 n.3, 173–75. To the extent that the articles are accurate, they indicate that the government is now investigating important issues raised by this court's decision. The court does not wish to discourage such investigation. The government, however, has a duty to conduct any such investigation in a manner that is consistent with all applicable rules, regulations, and orders.[6]

Finally, for the purposes of illustrating the issues now presented, a January 21, 2000 *Boston Globe* article reflects an apparent violation of the Protective Order, which may be attributable to the government. Ex. 9. It describes an FBI report that was produced in discovery. Feb. 15, 2000 Tr. at 87; May 22, 1998 Tr. (Under Seal) at 136. The information in that report was also referenced in a sealed order, and discussed several times in conferences that were closed to the public in order to maintain the confidentiality of sealed documents and information. Nov. 14, 1997 Order (under seal), ¶¶ 8 and 26; May 19,

1998 Tr. (under seal) at 179–80, 183–84; May 20, 1998 Tr. (under seal) at 145–48.

The article states, in part that:

an internal [FBI] document shows that former agent John Connolly, Bulger's handler, allegedly tried to steer police away from [Kevin] O'Neill, a key witness to the [Tim] Baldwin murder.

\*        \*        \*        \*        \*        \*

In February 1992, Thomas Hughes, then head of the Boston FBI office, notified the investigatory agent John Gamel, about his concern that the inquiry into possible misconduct by Connolly was aimed at an agent who had retired. Connolly had left the bureau in 1990. Hughes also noted that "that statute of limitations may have run."

The matter was revived in 1997 and 1998 when investigators looking at possible FBI corruption again interviewed Bradley about his alleged meeting with Connolly. The encounter was originally scheduled to be revealed during hearings U.S. District Judge Mark L. Wolf held throughout much of 1998, but Bradley was one of a number of witnesses who were dropped after the judge urged both sides to trim the witness list.

Ex. 9.

The foregoing information refers to a document subject to the Protective Order

---

**6.** Similarly, the government strenuously, and unsuccessfully, opposed disclosure to defendants and the court of certain relevant FBI reports containing information received from informants and cooperating witnesses, including Halloran, arguing among other things, the importance of maintaining the confidentiality of those documents. Some documents relating to Halloran's charges against Bulger and Flemmi were given for review to Boston Special Agent in Charge Barry Mawn and his Assistant, Mike Wolf, because they were deemed to be "singular and sensitive." Sept. 15, 1999 Memorandum and Order at 173–74. Those documents were not produced in dis-

covery at the time required by this court's Orders. *Id.* As a result, relevant witnesses could not be questioned concerning them. *Id.*

On January 26, 2000, *The Boston Herald* reported on, and reproduced, an FBI report of an interview that allegedly relates to whether FBI agent John Connolly served as a "lookout" in connection with the Halloran murder. According to the prosecutors, however, the government has yet to conduct any investigation concerning the disclosure of that confidential document to the media. Ex. 6; Feb. 15, 2000 Tr. at 15, 67, 81.

and accurately describes the essence of closed judicial proceedings. Some of the information reported could have been received from defendants and/or their counsel. However, the description of the conversation between FBI agents Hughes and Gamel, including a direct quotation from Hughes, indicates that at least one of the sources may be employed by the government. In the circumstances, a *prima facie* showing has been made of a violation of the Protective Order by the government.

■ If further inquiry demonstrates that Rule 6(e), Local Rule 83.2A, 28 C.F.R. § 50.2, and/or the Protective Order have been violated, there are a range of sanctions and remedies that may be imposed. These could include: (1) imprisonment for criminal contempt, *see* Fed.R.Crim.P. 6(e)(2) and *Blalock v. United States*, 844 F.2d 1546, 1558 (11th Cir.1988) (Tjoflat, J. concurring); (2) a prospective, permanent injunction against comments to the media by all government personnel, *see* Local Rule 83.2B, *In re Sealed Case No. 98–3077*, 151 F.3d at 1068, *Barry*, 865 F.2d at 1321–22, *Levine*, 764 F.2d at 599; or (3) dismissal of the case, *see United States v. Williams*, 504 U.S. 36, 46 & n. 6, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) ("the supervisory power can be used to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by the Court and Congress to ensure the integrity of the grand jury' functions," such as Rule 6(e) (internal citation omitted)).

It is premature, at best, however, to focus on the appropriate remedy for possible government misconduct in the instant case. It is now uncertain whether government misconduct has occurred or, if it did occur, can be demonstrated. However, as described earlier, because a *prima facie* showing of such misconduct has been made, the government must further address the questions presented. *In re Sealed Case No. 98–3077*, 151 F.3d at 1067–68. The court is ordering the government to respond *ex parte*, at least initially, to that *prima facie* showing in order to minimize the risk that any continuing investigation will be injured unnecessarily.[7] *Id.* at 1073–77. If the court finds that a violation of an enforceable standard has been established, Flemmi will be permitted to participate in the proceedings to determine the appropriate sanction or remedy. *Id.* at 1076.

In view of the foregoing, it is hereby ORDERED that, by March 17, 2000, the government shall file, *ex parte* and under

---

7. In view of the *prima facie* showing of violations of Rule 6(e), Local Rule 83.2A, 28 C.F.R. § 50.2, and the Protective Order, it would be permissible for the court to issue now an order enjoining all government attorneys, agents, and employees from making statements likely to generate publicity concerning the continuing investigation(s) of Flemmi. *United States v. Eisenberg*, 711 F.2d 959, 964 (11th Cir.1983); *In re Sealed Case No. 98–3077*, 151 F.3d at 1074. Indeed, in *Eisenberg*, 711 F.2d at 964, the Court of Appeals for the Eleventh Circuit stated that when a *prima facie* showing of a Rule 6(e) violation is made, such an order is required.

This court, however, believes that it retains discretion with regard to the issuance of an injunction. As Flemmi's counsel noted at the February 15, 2000 hearing, the barrage of publicity prejudicial to Flemmi has abated since the filing of the Motion on January 28, 2000. Feb. 15, 2000 Tr. at 12–13. In view of this fact, and the fact that the court is ordering that the government promptly file affidavits seeking to negate the inference that it is responsible for some or all of the publicity at issue, the court is not now issuing an order placing further restrictions on statements by government officials to the media. However, any recurrence of the problems which prompted the Motion may result in the issuance of such an injunction prior to the completion of the process being initiated by today's Order.

seal, for the court's *in camera* consideration:

1. An affidavit of the United States Attorney:

(a) identifying each grand jury that has since September 15, 1999, conducted an investigation in which Flemmi was a subject or target;

(b) identifying each attorney for the government with knowledge of "any matter occurring before" each such grand jury, as that phrase has been defined in this Memorandum;

(c) identifying each federal, state or local agent, officer, or employee to whom any matter occurring before each such grand jury has been disclosed;

(d) attaching each submission to the district court made pursuant to Federal Rule of Criminal Procedure 6(e)(3)(B) concerning each such grand jury;

(e) identifying each attorney, and federal, state, or local officer, agent, or employee who has since September 15, 1999, participated in, or been provided information from, any investigation relating to Flemmi, including but not limited to any search for buried bodies in Dorchester, Massachusetts, any search of Flemmi's mother's home, and any proffer from, or discussion with, any of the cooperating individuals whose names were redacted from the affidavits the government filed publicly in opposition to the Motion;

(f) identifying the state or local personnel who have been cross-designated as federal agents in any investigation relating to Flemmi;

(g) identifying each government attorney, agent, officer, and employee who was informed of the FBI 302 referenced in Exhibit 9 hereto, the November 14, 1997 sealed Order, and/or the closed proceedings relating to the matter discussed in the FBI 302;

(h) describing the date(s) and substance of the instructions, if any, that were given to any or all of the government attorneys, agents, officers or employees participating in, or receiving information from, any investigation relating to Flemmi regarding the requirements of Rule 6(e), Local Rule 83.2A, 28 C.F.R. § 50.2, the Protective Order, and/or statements to members of the media or other individuals not participating in any investigation of Flemmi;

(i) describing (with the commencement date) any investigation that was conducted by the government; (i) prior to January 28, 2000; (ii) prior to February 15, 2000; or (iii) since February 15, 2000, to determine whether any government attorney, agent, officer, or employee was a source for any of the publicity which generated the Motion, including but not limited to Exhibits 1–10 hereto;

(j) describing the results of any such investigation; and

(k) describing the scope of any such continuing investigation.

2. An affidavit from each individual identified in response to ¶ 1 hereinabove, representing that he or she has read this Memorandum and Order, including Exhibits 1–10 hereto, and stating:

(a) his or her name and employment;

(b) if employed by a state or local agency, whether he or she has been cross-designated as a federal employee for the purpose of any investigation relating to Flemmi;

(c) whether he or she received any instruction concerning Rule 6(e), Local Rule 83.2A, 28 C.F.R. § 50.2, the Protective Order, and/or statements to members of the media or other individuals not participating in any investigation of Flemmi. If so, the date(s) and substance of such instruction shall be described;

(d) whether he or she was informed of any matter occurring before any grand

jury investigating Flemmi, among others, including but not limited to the grand juries which indicted the cases of *United States v. Connolly, et al.*, Cr. No. 99–10428–JLT and *United States v. Kevin Weeks, et al.*, Cr. No. 99–10371–RGS. If so, he or she shall state the source(s) of all such information;

(e) whether he or she discussed any matter occurring before any grand jury investigating Flemmi with anyone other than government attorneys, agents, officers or employees who had previously been identified as having been authorized to have access to such information in submissions to the court made pursuant to Rule 6(e)(3)(B). If so, he or she shall identify such individual(s), and describe the substance of the communication(s);

(f) whether he or she: (i) understood that a grand jury had issued subpoenas to current and former FBI agents; (ii) understood that former FBI agents H. Paul Rico, James Ring, and/or Nicholas Gianturco were subjects of a grand jury investigation; (iii) understood that a grand jury was investigating whether any FBI agent(s) had played any role in the possible murders of informants, including but not limited to John McIntyre; (iv) understood that former FBI agent Roderick Kennedy had testified before a grand jury; (v) understood that Francis Salemme had testified before a grand jury; (vi) participated in a search for buried bodies in Dorchester, Massachusetts, or received any information concerning such a search, including but not limited to the identities of the bodies being searched for or found; (vii) received any information that McIntyre or anyone else was killed in Pat Nee's former home or participated in a search of that property; (viii) participated in a search of Flemmi's mother's home; (ix) possessed or read any FBI report relating to the investigation of the murder of Brian Halloran or any communication between John Connolly and Boston Police Detective Brendan Bradley; or (x) received any information understood to have been provided to the government by John Martorano, Francis Salemme, or Kevin Weeks;

(g) whether he or she has since September 15, 1999 communicated with any member of the media, including any reporter from *The Boston Globe* or *The Boston Herald*, including but not limited to Ralph Ranalli, Shelley Murphy, Andrea Estes, Jonathan Wells, Jack Meyers, Dick Lehr, or John Ellement. If so, he or she shall describe: (i) the date of each such communication; (ii) what was said in each communication, including whether any matter reported in Exhibits 1–10 hereto was discussed; (iii) whether she or he provided any member of the media with any document(s); (iv) a description of any such document(s); and (v) whether any of the foregoing communications or disclosures were authorized by, or known to, any other government employee; and, if so, (vi) by whom;

(h) whether he or she has any information concerning any possible source of any of the information reported in Exhibits 1–10 hereto and, if so, describing that information.

3. An affidavit of the Special Agent in Charge of the Boston Office of the FBI describing (with commencement date(s)) any investigation that has been conducted to determine the source(s) for Exhibits 6, 7 and 10 hereto, the results of any such investigation, and the scope of any continuing investigation.

4. A memorandum addressing: (a) whether Rule 6(e), Local Rule 83.2A, 28 C.F.R. § 50.2, and/or the Protective Order have been violated; (b) whether additional investigation should be conducted to determine whether any such violation has occurred, and, if so, how that investigation should be conducted; and (c) whether the

court should issue an order expressly governing the extrajudicial statements which may be made by government agents, officers, and employees in addition to attorneys.

In addition, the government shall, by March 17, 2000, file for the public record a memorandum addressing: (a) the extent, if any, to which Local Rule 83.2A applies to government agents, officers, and employees in addition to attorneys; and (b) whether 28 C.F.R. § 50.2 is judicially enforceable.

JOINT EXHIBIT 94-1087 8/15/0

B:14 BOSTON HERALD FRIDAY, SEPTEMBER 25, 1998

# Grand jury convenes on FBI agents' alleged misconduct

By RALPH RANALLI

A federal grand jury has been convened in Hartford to hear allegations of criminal misconduct by controversial former FBI top echelon informant handler John Connolly and other agents stemming from the ongoing Boston FBI scandal, federal prosecutors said yesterday.

Federal officials announced previously that Connecticut Deputy U.S. Attorney John Durham had been appointed to look into whether any FBI agents broke the law while protecting valuable Mob informants — especially South Boston crime boss James "Whitey" Bulger and his longtime partner in crime, Stephen "The Rifleman" Flemmi of Quincy.

Now a federal prosecutor has revealed that a grand jury will 'call witnesses in the pursuit of criminal charges.

One source familiar with the probe said at least a half-dozen subpoenas had already been issued to current and former FBI agents. Assistant U.S. Attorney James D. Herbert made the disclosure during arguments in federal court about whether Connolly — a central figure in the case — should be given immunity from prosecution in return for his testimony in ongoing FBI misconduct hearings in Boston.

The hearings are part of a 1995 racketeering case against Flemmi, 64, Bulger, 69, reputed New England Mafia boss Francis P. "Cadillac Frank" Sa-

could put him into the grand jury investigating FBI misconduct."

"Wolf was apparently concerned about a basic problem with the investigation of Connolly and other agents: the five-year statute of limitations on obstruction of justice.

Obstruction is the most likely charge faced by agents who tipped off Bulger, Flemmi and other informants about pending investigations or indictments and the vast majo...

Citation
10/11/99 BOSTONG B1
 /11/99 Boston Globe B1
1999 WL 6084522

Search Result

Rank 1 of 1

The Boston Globe
Copyright 1999

Monday, October 11, 1999

METRO/REGION

### FBI role in man's slaying probed > Grand jury seeks links in Bulger case
#### Shelley Murphy, Globe Staff

Six weeks after the FBI learned that a Quincy man had implicated longtime informants James J. "Whitey" Bulger and Stephen Flemmi in an ill-fated plot to ship guns to the Irish Republican Army, he vanished.

A federal judge concluded last month that there was "reason to be concerned" that retired FBI Agent John J. Connolly had warned Bulger and Flemmi that John McIntyre was cooperating against them -- a breach that probably would have marked McIntyre for death.

Still, US District Judge Mark L. Wolf said he couldn't determine whether corrupted agents played a role in the slaying of McIntyre. The reason: both Flemmi and the FBI sidestepped the explosive issue last year during lengthy hearings into the bureau's relationship with Bulger and Flemmi.

Now a federal grand jury in Boston and a team of FBI agents brought from out of town are picking up where Wolf left off. They are investigating charges of FBI corruption and misconduct raised during the hearings with an eye toward bringing criminal charges against former or current agents.

As part of that probe, they are looking at what role, if any, FBI agents played in a series of 1980s gangland slayings, including that of McIntyre and several other FBI informants who could have linked Bulger and Flemmi to serious crimes.

Retired FBI Agent Roderick Kennedy, who interviewed McIntyre in the fall of 1984, was called before the grand jury during the summer and asked whether he had ever told Connolly that McIntyre was cooperating against them, according to sources.

Kennedy insists that he never told Connolly that McIntyre had

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

10/11/99 BOSTONG B1

'mplicated Bulger and Flemmi in the gun-running case, but knows that ɔnnolly was aware of it at the time, sources said.

"It wasn't a big secret in the FBI that McIntyre was cooperating," said one source, recounting a meeting in the FBI's Boston office, attended by Connolly and Kennedy, in the fall of 1984. McIntyre's allegations were discussed during that meeting.

But in a recent interview, Connolly vehemently denied knowing that McIntyre was cooperating before he vanished.

"I never even heard his name before he was killed. I have no recollection of ever being told that McIntyre was a source for anyone," he said.

Connolly, who was the longtime FBI contact for Bulger and Flemmi before retiring from the bureau in December 1990, said he does not fear the grand jury investigation, because "I have done nothing wrong."

McIntyre, despondent after his arrest by Quincy police in 1984 after a domestic squabble, offered an insider's account of the gunrunning operation weeks earlier by a gang of Boston underworld igures working with a group of Irish terrorists.

The 32-year-old carpenter, ex-Marine, and IRA sympathizer revealed that he was part of the crew aboard the Valhalla, a Gloucester fishing trawler, when it set sail for Ireland on Sept. 14, 1984. The boat was loaded with 7 tons of weapons worth more than $1 million, headed for delivery to the IRA.

McIntyre said Bulger, a notorious South Boston crime boss, and Flemmi, his sidekick, had helped engineer the operation, along with Charlestown organized crime figure Joseph Murray.

At sea, the Valhalla transferred its cargo of rifles, machine guns, bulletproof vests, hand grenades, and rocket warheads to the Irish trawler Marita Ann, then plotted a course straight back to Boston.

The Marita Ann never made it back to port. It was intercepted 2 miles off the coast of Ireland by the Irish Navy, which arrested everyone on board and confiscated the arsenal.

When word of the seizure was broadcast on the local news, a bug 'hat had been hidden in Bulger's Quincy condominium by the federal ʃrug Enforcement Administration recorded him as saying, "That's our

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

10/11/99 BOSTONG B1

ᵃhipment. That's ours."

McIntyre confirmed Bulger's link to the Valhalla and that one Bulger associate, Patrick Nee, had been on board during the weapons transfer while another, Kevin Weeks, had been involved in the planning.

He also provided information about a related venture involving the smuggling of 36 tons of marijuana into Boston aboard the freighter Ramsland by the same men involved with the Valhalla arms shipment.

"We had to give him over to other agencies," said Richard Bergeron, a former Quincy police detective who was among the first to interview McIntyre. "He had way more than what the Quincy police could handle."

Quincy police gave McIntyre's information to Kennedy -- the bureau's liaison to the DEA and other law enforcement agencies on drug cases -- and to US Customs agent Phil Brady. Later, Kennedy interviewed McIntyre and wrote an internal report detailing his claims that Bulger was linked to the Valhalla.

McIntyre was last seen on Nov. 30, 1984, after telling his family ᵗat he was going to meet Nee. Investigators suspect he was slain, ᵦut his body has not been found.

Nee and Murray, who was killed by his wife in 1992, were later convicted of gunrunning charges involving the Valhalla along with a group of other men. Neither Bulger nor Flemmi was charged in that case.

Today, Bulger, who is a fugitive, and Flemmi face a federal racketeering indictment on charges that they conspired with reputed New England Mafia boss Francis Salemme to control the region's underworld rackets, shaking down drug dealers and forcing bookmakers to pay rent.

Last month, Wolf refused to drop the 1995 case against Flemmi and Bulger. The judge rejected Flemmi's claim that the FBI had promised the pair that they'd never be prosecuted if they provided the bureau with information that helped decimate their rivals in the New England mob.

However, Wolf has scheduled more hearings to determine whether any of the information they provided as informants was used to obtain the ᶦndictment against them, in which case he may dismiss some or all of ᵗe charges.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

10/11/99 BOSTONG B1

In his 661-page decision, Wolf cited numerous instances in which .e FBI had protected Bulger and Flemmi over several decades by alerting them to investigations. Flemmi became an FBI informant in 1965; Bulger followed a decade later.

Wolf said there was evidence that Connolly and John Morris, his former FBI supervisor who has admitted pocketing $7,000 in bribes from Bulger and Flemmi, protected the men by identifying a dozen informants working for the FBI and other law enforcement agencies.

"These disclosures were usually made so that Bulger and Flemmi could avoid making any unnecessary, incriminating statements to other informants," Wolf wrote.

Connolly, who invoked his right against self-incrimination, refused to testify before Wolf. He has denied ever identifying informants to Bulger and Flemmi.

Wolf said he couldn't determine whether the FBI put McIntyre's life in danger because "it evidently was not in either the interest of Flemmi or of the FBI to have this issue fully developed in this case."

But Bergeron, who is now chief of police in Webster, is hopeful ..iat the FBI will uncover the truth about what happened to McIntyre.

"I have faith that the bureau will solve the mystery," he said.

---- INDEX REFERENCES ----

NAMED PERSON:      KENNEDY, RODERICK

KEY WORDS:         BOSTON; ORGANIZED CRIME; TRIAL; NAME-FLEMMI; NAME-BULGER; F

NEWS SUBJECT:      Local/Regional Section (LCR)

REGION:            Massachusetts; Eastern U.S.; United States; North America
USE US NME)

EDITION:           CITY EDITION

Word Count: 1157
10/11/99 BOSTONG B1
END OF DOCUMENT

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

# Cops dig for bodies of Mob victims

## Source: Bones found at 'dumping ground'

**By ANDREA ESTES and JONATHAN WELLS**

The Boston Herald
Friday, January 14, 2000
Andrea Estes & Jonathan Wells

JOINT EXHIBIT
3
94-10287

Armed with new information from a top lieutenant in the Winter Hill gang, investigators last night dug up the partial remains of what they believed may be victims of Mob hits, sources said.

"It's a dumping ground," said one source.

Using heavy equipment under bright lights, crews of crime scene specialists scoured a culvert beside the Southeast Expressway in Dorchester, across from Florian Hall.

They were looking for three bodies — two men and one woman — and, according to one source, found partial remains including "big bones, leg bones."

Investigators rushed last night, in sub-zero weather, to unearth the evidence that may have been buried decades ago. According to one source, investigators were led to the

**Turn to Page 4**

### From Page 1

scene by James "Whitey" Bulger confidant Kevin Weeks, who was arrested in November on racketeering charges.

Sources said investigators moved quickly because they feared the clues would remain hidden under frozen ground until spring and that Winter Hill mobsters knew Weeks was talking and would move to get rid of the evidence.

"There was activity in these areas so we had to move," said a source.

Also armed with a search warrant, they searched a shed next to Stephen "The Rifleman" Flemmi's mother's home in South Boston, a source said. That source said authorities were looking for weapons and ammunition and "other forensic evidence."

"They found m16 ammunition, several silencers in "a secret thing where Flemmi had his guns hidden," said a source, adding the ammunition was high-velocity rifle bullets used by the U.S. Army. One source said it may have been weapons and ammunition stolen from the Danvers armory.

"We saw people around the (shed) and we were going to wait for better weather. They got nervous. This was a rush job."

DEA agents and state troopers, armed with a search warrant, dug for hours in a culvert beside the Southeast Expressway, across from Florian Hall.

Speculation has been rampant that Weeks, arrested in November with cohort Kevin O'Neil, would cooperate with authorities.

He disappeared last week from his jail cell for several hours, fueling rumors he was meeting with law enforcement authorities.

His lawyer Dennis Kelly declined comment.

Sources said Weeks gave investigators the information on the weapons and the bodies to prove his worth as an informant in hopes of getting a lighter sentence.

"This is going to confirm he is not a liar and wants to do a deal."

One source said the murders took place years ago and are related to Bulger and Flemmi.

Two of the three bodies may be Edward "Wimpy" Bennett, 47, and his older brother, Walter, 55, said one source. No trace of Wimpy or Walter Bennett was ever found after they vanished in 1967.

Another body could be that of Thomas

# Authorities dig for remains of possible Mob victims

The Boston Herald
Friday, January 14, 2000
Andrea Estes & Jonathan Wells
(Continued)

King, of South Boston, who was killed in the 1970s.

Former Winter Hill hitman-turned-cooperator John Martorano reportedly told investigators that when he and Bulger were driving over the Neponset Bridge, Bulger said "Tip your cap to Tommy King."

Or one of the victims could be John McIntyre of Quincy, who disappeared after letting the FBI know about Bulger and Flemmi's delivery of guns to the IRA aboard the ship Valhalla. One source said that some of the weapons and ammunition found at Flemmi's mother's house in South Boston "matched up" with what was found on the Valhalla.

McIntyre's truck was found just a short distance from the dig site at Florian Hall — outside the Upstairs Downstairs bar — after he disappeared.

One of the bodies could also be convicted bank robber Arthur "Bucky" Barrett, one of six men responsible for the $1.5 million heist at the Depositor's Trust Bank in Medford on Memorial Day, 1980.

The woman could be Debbie Davis, Flemmi's former girlfriend. Davis was 17 when Flemmi found her working in a Brookline jewelry store.

They had been involved for nine years when she vanished Sept. 17, 1981, from their Randolph apartment.

Edward Bennett's son Billy, last night said he hadn't heard that investigators were looking for his father.

"If they find something or make positive ID, looks like I'll be coming up there for a funeral," he said, adding that the family has been disappointed many times before when searches turned up nothing.

Martorano was the first to admit his involvement in Winter Hill murders, though he may not have known where the bodies were buried. Since Martorano's defection, others in the know have agreed to tell what they know about Flemmi and Bulger's misdeeds — many of their former cohorts were enraged when Flemmi admitted that while he and Bulger were running the Winter Hill crew he was also working as a high-level FBI informant.

Reputed New England Mafia boss Francis "Cadillac Frank" Salemme and a reputed Robert DeLuca recently pleaded guilty.

Salemme had originally been charged with the Bennett murders, but the charges were dropped.

The Boston F
Friday,
January 14, 2
Andrea Estes
Jonathan We
(Continued)

**SCENE:** State police investigators explore a site in the parking lot across from Florian Hall on Hallett Street in Dorches

STAFF PHOTOS BY ROBERT ENG

The Boston Globe
Friday, January 14, 2000
Shelley Murphy & John Ellement

# Search is tied to alleged mob hits

## Police dig in gully for victims' bodies

By Shelley Murphy and John Ellement
GLOBE STAFF

Armed with new information possibly linking reputed South Boston crime boss James "Whitey" Bulger and his longtime cohort, Stephen "The Rifleman" Flemmi, to murder, federal and state investigators began digging yesterday in a gully along the Southeast Expressway in Dorchester for the bodies of two Quincy men.

Working with searchlights and battling snow squalls, State Police, the federal Drug Enforcement Administration, and Boston police worked late into the night on Hallet Street across from Florian Hall searching for the remains of John McIntyre. and Arthur 'Bucky' Barrett, sources said.

Earlier in the day, investigators searched a section of Flemmi's mother's home in South Boston for weapons, silencers and ammunition, according to sources familiar with the search.

Investigators removed some items from a screened patio next to the home of Flemmi's elderly mother, Mary, but officials declined to disclose what they had taken.

US Attorney Donald K. Stern, whose office obtained search warrants, declined to comment on yesterday's activities

Bulger and Flemmi, both longtime FBI informants, were indicted on federal racketeering charges in 1995.Last month, they were charged in a new indictment with their longtime FBI handler, John Connolly.

But more charges are expected since a number of cohorts have turned against them.

In addition, investigators have long suspected Bulger and Flemmi in the disappearance of Barrett, a convicted bank robber, and McIntyre, an IRA sympathizer, whose bodies have never been found.

Barrett was one of six men who broke into the Depositors Trust bank in Medford and stole $1.5 million during a Memorial Day robbery in 1980 that also involved corrupt police officers. Bulger and Flemmi are suspected by some investigators of killing Barrett and stealing his share of the loot.

During hearings in federal court in 1998, a former FBI agent testified that he tried to scare Barrett into cooperating, by warning him that Bulger and Flemmi knew he was involved in the heist and were preparing to try to extort money from him.

SEARCH, Page B6

# Search said to be tied to mob hits

The Boston Globe
Friday, January 14, 2000
Shelley Murphy & John Ellement
(Continued)

**SEARCH**
Continued from Page B1

Barrett refused to cooperate, but disappeared in 1983 and is presumed dead.

Confessed mob hit man John Martorano has admitted killing 20 people and has implicated Bulger and Flemmi in several of the murders.

Reputed Mafia boss Francis "Cadillac Frank" Salemme testified against Connolly, Flemmi, and Bulger before a federal grand jury, according to sources.

The new search has triggered speculation that other former associates may be cooperating with authorities.

Flemmi is charged in the 1995 indictment with murdering four men in the 1960s gang wars, including two whose bodies have never been found: brothers Edward and Walter Bennett of Dorchester.

Flemmi has also been named as a suspect in the September 1981 disappearance and presumed murder of his then-girlfriend, Debra Davis. The 26-year-old Davis was living with Flemmi in Randolph but planned to leave him.

McIntyre disappeared in 1984 after Bulger and Flemmi reportedly learned that he was assisting federal agents investigating an ill-fated plot to run guns to the Irish Republican Army.

A federal judge concluded in September that Connolly tipped Bulger and Flemmi that McIntyre was an informant, a charge Connolly denied. McIntyre was last seen Nov. 30, 1984 as he was reportedly going to meet a Bulger associate.

*Mac Daniel of the Globe staff contributed to this report.*

THE BOSTON GLOBE ❖ FRIDAY, JANUARY 14, 2000

State and Boston police and federal Drug Enforcement Administration agents digging at a site on ___ Street in Dorchester last night.

The Boston Globe
Friday, January 14, 2000
Shelley Murphy & John Ellement
(Continued)

State Police and DEA agents leaving a house on East Third Street in South Boston last night after reportedly searching for weapons, silencers, and ammunition. The home belongs to Stephen Flemmi's mother.

# METRO REGION

GLAND

JOINT EXHIBIT
94-10287

THE BOSTON SUNDAY GLOBE • JANUARY 16, 2000

## A sinister new chapter in mobsters' story

By Shelley Murphy
GLOBE STAFF

They gained infamy as two of Boston's most notorious gangsters secretly working as FBI informants, protected from prosecution while they allegedly extorted money from drug dealers and bookies and killed those who got in their way.

But another sinister chapter in the lives of fugitive South Boston crime boss James "Whitey" Bulger and his longtime sidekick, Stephen "The Rifleman" Flemmi, was exposed last week when a trusted aide led investigators to a Dorchester grave site where two men and a woman allegedly killed by the pair in the 1980s were buried.

Even more stunning is the allegation by Kevin J.

Weeks, a top Bulger lieutenant sources said is cooperating with authorities. He has said the female victim is Deborah Hussey, who was 26 when she disappeared in the fall of 1984, and the daughter of the woman Flemmi lived with for many years.

The allegation that Bulger or Flemmi or both may have been involved in the murder of a woman is no surprise though to law enforcement authorities, who say the pair have a history of seducing, then mistreating, women.

Flemmi, law enforcement sources said, has long been a suspect in the disappearance of Hussey and his former girlfriend, Debra Davis, who was also 26 when she vanished on Sept. 17, 1981.

Bulger and Flemmi "had a thing for young girls,"

FLEMMI, Page B6

DEBRA DAVIS
Vanished in 1981
1981 FAMILY PHOTO

'Right now I am in Tortuguero which is on the Caribbean side of Costa Rica. ... I got there first on a bus through a banana plantation.'

ALEX SILNOR, in his family's travel journal

---

### EILEEN MCNAMARA

## [O]s need [to b]e watched

IT IS HARD TO FIND AN upside to Harvard Pilgrim's financial crisis, but the collapse of the largest health maintenance organization in Massachusetts does provide an opportunity to reconsider the role of state government in health care oversight.

In the absence of leadership by the Cellucci administration — still in Florida? — Attorney Tom Reilly has reasserted the [role i]n the delivery of medical care by [placin]g HMO under state receivership. [It's a] long time coming.

[In the] public's voice has been ab[sent] practices that were driven [by] total commitment of HMOs to extract savings. As one HMO after another is [left] insolvent and underpriced

---

## Get [...]
## DNA [...]
## invo [...]
## rus[...]

## Police
## their p

By Se[...]
GLO[...]

They may h [...] habit or addicte[d...] strain of the [...] them reach for n [...] their nerves.

But when I [...] frey lily smoke[...] while being que[...] by police they s [...]

GLOBE STAFF PHOTO / JOHN TLUMACKI

Paul Okson of Milton yesterday visited the Dorchester site where officials recovered the remains of three people on Friday.

# A sinister new chapter opens in Bulger, Flemmi story

**FLEMMI**
*Continued from Page B1*

one of those sources said. "Both Stevie and Jimmy have a reputation with young women to the point that it was well known in South Boston that you had to lock up your younger sister when they were around."

Hussey had allegedly been having sexual relations with Flemmi since she was a teenager, and was threatening to expose the relationship to her mother, sources said. Flemmi shared his Milton home with Marion Hussey and helped her raise her two daughters and two sons from an earlier marriage.

"The consensus of opinion is that he was scared because she was so young when it started," said one law enforcement source.

Digging through the night in Thursday's bitter cold, officials from the State Police, federal Drug Enforcement Administration, Internal Revenue Service, Boston Police, and Suffolk County Medical Examiner's office unearthed the remains in a gully along the Southeast Expressway across from Florian Hall.

Officials said they could not positively identify the victims until DNA testing is complete. The process could take up to two months, officials said.

But sources said Weeks led them to the burial site and identified the dead as Hussey, Arthur "Bucky" Barrett, and John McIntyre.

Bulger and Flemmi have long been suspects in the murder of Barrett, one of six men charged in the $1.5 million Depositors Trust Bank heist in Medford in 1980, and McIntyre, suspected of cooperating against Bulger in an ill-fated plot to run guns to the Irish Republican Army. Barrett disappeared in 1983 and McIntyre vanished in 1984.

Weeks, who has been described as Bulger's "surrogate son," has reportedly turned on Bulger since his own indictment on federal racketeering charges in November.

Weeks' cooperation is likely to lead to more charges against Bulger and Flemmi, who currently face two racketeering indictments, one returned in January 1995 and the other handed up last month.

The most recent indictment also charges their longtime FBI handler, retired FBI agent John J. Connolly Jr., accused of protecting the pair by tipping them to investigations and warning them to flee on the eve of the 1995 indictment.

Bulger hasn't been seen in public since and remains a fugitive. Flemmi is being held in protective custody at the Plymouth House of Correction.

Besides the three victims discovered last week, Bulger and Flemmi are being eyed in other murders over the past several decades. Relatives of other victims showed up at the burial site last week hoping for news about their lost loved ones.

"I'm still not giving up hope that that's her," said Victor Davis, 34, in a telephone interview yesterday, noting that DNA tests have not confirmed the identity of the woman found in the grave.

Davis said his sister, Debra, vanished after trying to break off a nine-year relationship with Flemmi when she fell in love with a Mexican businessman during an Acapulco vacation.

While Davis said he thinks Flemmi may have been motivated by jealousy, he also suspects Flemmi was worried because Debra Davis knew he was an informant.

In 1982, FBI agents investigated Davis' disappearance from the apartment she shared with Flemmi in Randolph but apparently never confronted Flemmi, said Davis and law enforcement sources.

"Instead of getting involved in helping the case, they just involved and hindered it," Davis said. "The FBI covered this up. The FBI owes my mother an apology."

Davis said Flemmi met his sister when she was 17 and working at a Brookline jewelry store, and lavished her with fancy cars, expensive clothes, and jewelry.

When Debra Davis disappeared, Flemmi continued to visit the Davis family home, showering his attention on her younger sister, even letting the 13-year-old girl drive his Jaguar.

It was vintage Flemmi, according to one law enforcement source, who said, "He was always remanding these girls with cars. He bribed them with gifts."

---

*Jenni Watson of the Globe staff contributed to this report.*

---

shocked, especially when you see the graphic pictures of the body bag and then you imagine things, you try to think of what was the condition of the body," he said.

Hussey's mother, Marion, wouldn't comment, but her attorney, Kevin Glynn, said they are beginning Republican Army symbol and Deborah Hussey, the year-old daughter of Flemmi's longtime girlfriend.

Bulger, a fugitive, and Flemmi, in jail awaiting trial, were indicted on racketeering charges and have been suspects in the disappearances burned.

Another elderly man who stopped his car to look said, "It's quite a story. They got a lot of nerve, those guys."

Look for our advertisement in today's Travel Section.

*Fairmont*
HOTELS & RESORTS

Extraordinary Hotels. Extraordinary Places

Contact your travel agent or call 1-800-974-5577 or access www.fairmont.com

**DONATE THAT CAR!**
Full Tax Deduction - Free Pickup
No DMV Filing - Running or Not

# Sources: Connolly nearby at Mob slaying

The Boston Herald
Wednesday, January 26, 2000
Jonathan Wells

JOINT EXHIBIT
6
94 - 10287

## Flemmi allegedly plac‹ FBI agent near Mob h

## Flemmi allegedly told pals of agent's presence

**By JONATHAN WELLS**

Mob boss Stephen "The Rifleman" Flemmi has told at least two other reputed gangsters that his longtime FBI handler, former agent John Connolly, was in the vicinity of a 1982 gangland murder in which Flemmi has long been a suspect, sources confirmed yesterday.

If what Flemmi has told his cohorts is true, it could mean more trouble for Connolly, a retired Boston FBI agent who has already been charged with breaking the law in his efforts to protect Flemmi and his associate, James J. "Whitey" Bulger, who were both prized FBI informants handled by Connolly.

Knowledgeable sources said Flemmi has told fellow mobsters that Connolly was in the area of the old Topside Bar on Boston's waterfront in the early evening of May 11, 1982.

At approximately 6 o'clock that night, a Winter Hill Gang member named Brian Halloran walked out the front door of the Topside on Northern

Turn to Page 14

**From Page 1**

Avenue with a friend. Both men were shot to death by unidentified gunmen.

The associates to whom Flemmi told this came away from the conversations with the impression that, because he was in the area, Connolly likely knew of the plan to murder Halloran and may have been serving as either "backup" or as a lookout, sources said.

The murder of Halloran and his friend, Michael Donohue, remained a cold case in police files for more than a decade. Recently, however, it has drawn new scrutiny by federal and state authorities investigating Flemmi and Bulger and their dealings with FBI agent Connolly.

In the course of those investigations, sources said one former Flemmi associate told federal investigators that Connoll the area of the Topside E Halloran and Donohue w dered and cited Flemmi as the source.

"That is absurd, perio‹ nolly said last night. "I Boston when Halloran w: I was in work when Hallc killed. Like a lot of pec sure, I watched it on the was in work and I went h‹ I watched it on the new: was the first I ever knew

Asked why Flemmi wo his associates that Conno in the area when the mob . pened, Connolly said, "I d‹ lieve he ever did. And if it's completely erroneous.'

Connolly said he has he mors that FBI agents wei the scene the night Hallo Donohue were murdered. were never substantiated l one," he said.

Wednesday, January 26, 2000
Jonathan Wells
(Continued)

As they drove along Northern Avenue, Sgt. CONNELL noticed a brand new clean black car, possibly a Mercury Marquis, backed into a parking space perpendicular to the street. The car was occupied by a single white male who was seated behind the steering wheel and who was looking through a pair of binoculars toward the Topside (now The Pier) Restaurant on Northern Avenue. The car was parked on the right (north) side of Northern Avenue several feet east of the Commonwealth Pier overhang or bridge.

Sgt. CONNELL cannot recall whether the car was a 4-door or 2-door vehicle, but there was definitely no front license tag or vanity plate. The man using the binoculars was in his forties, dark clean cut hair, no facial hair observed, average build, wearing a dark business suit, a shirt and tie. He was possibly wearing sunglasses.

**WITNESS REPORT: This FBI document details the observations of a now-deceased Newton Police sergeant of suspicious activity around the site of a Mob slaying on the waterfront.**

There is, however, an FBI report obtained by the Herald that could shed some light on the matter.

According to the one-page FBI report, written one day after the murders, a witness observed a car parked on Northern Avenue, opposite the Topside approximately 10 minutes before Halloran and Donohue were murdered in front of the bar.

The witness, Newton Police Sgt. Marilyn Connell, was heading toward Anthony's Pier 4 Restaurant and said she saw a brand new clean black car, possibly a Mercury Marquis" parked on Northern Avenue, facing the Topside.

"The car was occupied by a single white male who was seated behind the steering wheel and was looking through a pair of binoculars toward the Topside (now the Pier) Restaurant on Northern Avenue," the report states.

"The man using the binoculars was in his forties, dark clean-cut hair, no facial hair observed, average build, wearing a dark business suit, a shirt and tie."

Connell is deceased, but a friend who was with her that evening, Amelia Pignatelli, said she remembers Connell telling her she had been interviewed by an FBI agent about what she saw. In fact, Pignatelli said her friend told her that an FBI agent would be calling her, as well, for a statement. Pignatelli said she never heard from the FBI.

There is little doubt that the target of the "hit" at the Topside was Halloran, who had been talking to agents in the FBI's Boston office about crimes committed by Flemmi and Bulger.

One of those crimes, Halloran told the FBI, was the 1981 murder in Tulsa, Okla., of businessman Roger Wheeler. Halloran told the FBI that he had been asked to murder Wheeler by Bulger and Flemmi, but had turned the job down.

But after questioning him for six weeks, the FBI decided to terminate Halloran as an informant and sent him back out on the street. He was killed several weeks later.

During recent hearings before Judge Mark Wolf in U.S. District Court, Agent Connolly's onetime FBI supervisor John Morris testified that he told Connolly that Halloran had implicated Flemmi and Bulger in a murder. Morris added that he believed Connolly then passed that information on to Flemmi and Bulger shortly before Halloran was murdered.

Yesterday, Connolly called Morris a "serial liar."

The FBI witness report identifying a car parked near the scene of the Halloran execution was never produced by the government in the Wolf hearings, according to lawyers familiar with the case.

Meanwhile, Flemmi pleaded not guilty to charges against him, wh part of the indictment aga nolly. The federal govern sentially charges Flemmi ticipating in a criminal pa with both Bulger and Con

Flemmi is still awaiting racketeering charges bro 1995. Bulger was also cha 1995, but fled and remains tive. Connolly has been with tipping Bulger so h escape.

Connolly, '59, retired fr agency in 1990 after a 22-reer. He has worked at Edison ever since, first as security and later as a l He was placed on paid lea his indictment.

John Durham, a federal cutor from Connecticut, is ing a special investigatio corruption and criminal doing in the FBI's Boston He is using FBI agents from parts of the country, not from Boston.

*Andrea Estes contributed to report.*

JOINT EXHIBIT

94-10287

# Trail of death

## Feds probe FBI agents' links to unsolved Mob slayings

BY JONATHAN WELLS

Federal authorities are probing as many as a dozen unsolved Mob murders dating back to the 1960s in an effort to find out if Boston FBI agents were either accessories to the killings or obstructed efforts to solve them, sources said.

■ INNOCENT VICTIMS KIN RELIVE TRAGEDY OF SLAYING, GELZINIS, PAGE 4

The initial investigation is being conducted by FBI agents from outside Massachusetts under the direction of John Durham, a federal prosecutor from Connecticut.

The probe by Durham's group has cast a dark cloud over the FBI's Boston office, FBI sources said, and Boston agents there are particularly dreading the possibility that colleagues may be linked in some fashion with past murders.

"I think the reaction is shock," said one former FBI agent. "Half of them wanted to believe it would go away, but it hasn't."

Sources said that in most of the murders under scrutiny, the chief suspects are Winter Hill Gang leaders

Turn to Page 4

The Boston Herald
Thursday, January 27, 2000
Jonathan Wells

# FBI probes agents' link to Mob slayings

The Boston
Thursday,
January 27,
Jonathan W
(Continued)

**From Page 1**

James J. "Whitey" Bulger and Stephen "The Rifleman" Flemmi — two prolific criminals who also served for much of the past 30 years as "top echelon" FBI informants.

The two FBI agents drawing the most scrutiny are retired agents John J. Connolly and H. Paul Rico, who at different times served as Bulger and Flemmi's FBI handlers.

Investigators are particularly interested in a series of related homicides in the early-1980s — the so-called Jai Alai murders — in which Bulger and Flemmi are suspected of executing four men in a span of 18 months.

They started in 1981, when a legitimate businessman named Roger Wheeler was found shot to death in his Cadillac at a Tulsa, Okla. country club. According to investigative reports, shortly before he was killed, Wheeler discovered that his company, Miami-based World Jai Alai, had been infiltrated by members of Boston's Winter Hill Gang and money was being skimmed from his operation.

In 1982, a Winter Hill gang member named Brian Halloran  and his friend Michael Donahue were gunned down in front of the old Topside bar on Northern Avenue. It turned out that shortly before he was killed, Halloran had been telling FBI agents that Bulger and Flemmi were responsible for Wheeler's murder.

Three months after the Halloran hit, the decomposing body of John Callahan, a one-time president of World Jai Alai and a reputed money-launderer for Bulger and Flemmi, was found in the trunk of his car at the Miami airport. Callahan was killed as detectives were trying to question him about the Wheeler and Halloran murders.

The Herald reported yesterday that, according to well-placed sources, Flemmi, who has been in jail since 1995, told some of his criminal cohorts that agent Connolly was in the area of the Topside bar on May 11, 1982, when Halloran and Donahue were murdered.

Those associates of Flemmi said they came away from their conversations with the Winter Hill boss with the impression that, because he was in the area, Connolly likely knew of the murder plot and may have been serving as "backup," or as a lookout, the sources said.

Just weeks before he was slain, Halloran had been identified entry into the Federal Witness Protection Program and terminated as an FBI informant after providing details about the Wheeler murder. Halloran had also told the FBI that ex-agent Rico, who at the time was working as head of security at World Jai Alai, was in on the murder plot and was picked up the leg work to set up Wheeler. Federal investigators are also reportedly looking at the 1964 murder of Ronald Dermody, a Somerville man who spoke on the telephone to Rico shortly before he was murdered in his car a mile from Rico's home in Belmont.

They are also interested in the 1965 murder of Edward "Teddy" Deegan, in which Rico handled a government witness, hitman Joseph "The Animal" Barboza, whose testimony may have sent at least one innocent man — Joseph Salvati — to prison for 30 years. Rico, a top agent who specialized in organized crime cases in Boston during the 1960s and 1970s, first cultivated Flemmi as an informant in 1965 and handled him for the FBI until he was transferred to

**BULGER:** Just weeks before he was slain, Halloran's murders to be had been ide reviewed by FBI

the FBI's Miami office in the early 1970s. Durham and his agents have refused to discuss their investigation.

In an interview Tuesday, Connolly denied he was in the vicinity of the Topside bar on the evening Halloran and Donahue were murdered. "That's absurd, period," he said.

Flemmi's lawyer, Michael Natola, said yesterday it is "outrageous" for anyone to suggest Flemmi would make statements, even to friends, that implicate him in a murder.

"If Flemmi had anything to do with a murder, why on earth would he tell anybody about this?" Natola said. "This is fairy tale stuff." Natola also said it is "outrageous" to suggest that an FBI agent would participate in any fashion in a Mob hit.

The Herald also revealed the existence of an FBI report written the day after Halloran and Donahue were murdered that indicates at least one unidentified man was near the scene just before the murder. In that report, an FBI agent recounts his interview with a witness who passed through the area approximately 30 minutes before the shootings and saw a "brand-new, clean black car" parked across Northern Avenue, facing the Topside bar.

"The car was occupied by a single white male who was seated behind the steering wheel and was looking through a pair of binoculars toward the Topside," the report states.

Lawyers involved in recent hearings before U.S. District Judge Mark Wolf on the FBI's relationship with Bulger and Flemmi say that particular FBI report was never produced by the government, although it certainly would have been relevant.

A spokeswoman for U.S. Attorney Donald Stern refused to comment when asked yesterday why prosecutors did not produce the document.

The Boston Herald
Thursday, January 27, 2000
Jonathan Wells
(Continued)

FILE PHOTOS

PLOT THICKENS: At left, John Connolly walks with his attorney, Robert Popeo, left, last year. Above, a police mugshot of Brian Halloran, a Winter Hill gang member who was murdered in a Mob hit in 1982.

JOINT EXHIBIT

The Boston Herald
Thursday, January 20, 2000
Jonathan Wells & Jack Meyers

# Grand jury examining Connolly real estate deals

# Zeroing in on Connolly

## Grand jury eyes real estate deals

other unit for $100,000.

Sources said it is likely that Ford, as a bookie, was required to pay tribute to Bulger and Flemmi, who had had tight control over illegal gambling in South Boston. Ford has since died.

After Connolly sold the home for $363,000 in February 1980 — he had bought it from Ford, he moved to a townhouse at 535 West Fourth St. in South Boston, which was part of the same condo development where "Whitey" Bulger and his top lieutenant, Kevin Weeks, had recently bought units.

The complex was developed by Barbara A. Buckley and her husband, convicted arsonist Francis X. Fraine, who reported selling all six units the same...

Registry of Deeds records show Connolly bought the two-story home from Robert W. Ford, a well-known bookie in South Boston who also had a contracting business and owned stores in the neighborhood...

BY JONATHAN WELLS
and JACK MEYERS

**The Boston Herald**
**Thursday, January 20, 2000**
**Jonathan Wells & Jack Meyers**
(Continued)

day, Aug. 19, 1988.

None of the buyers, Bulger and Weeks included, reported using a bank to finance the condo sales.

Records show Buckley sold Unit 327 to a middleman for "less than $100" and he turned around and sold it the same day for $150,000 to Bulger. The same arrangement was used that day for Weeks' unit next door at 329 West Fourth St.

Bulger sold his unit in June 1990 for $186,000 and Weeks sold his for $142,000 in October 1990, the day before Connolly sold the condo he was living in at Thomas Park.

Connolly, who has maintained he did nothing illegal in his years of handling Bulger and Flemmi as informants, could not be reached last night for comment on the grand jury subpoenas.

The Herald reported yesterday that Connolly reportedly received free household appliances for his house on Thomas Park from Broadway Appliance, a South Boston store controlled by Bulger and Flemmi.

Connolly denied the report.

Weeks, 43, a trusted aide to Bulger and Flemmi for nearly 20 years, was indicted for racketeering in November and recently began giving information to federal and state investigators on the criminal activities of his former colleagues.

Last Thursday, Weeks led investigators to a spot in Dorchester near Florian Hall where the skeletal remains of three Winter Hill Gang murder victims were buried.

Weeks also directed authorities to a small structure behind the home of Flemmi's mother in South Boston, where they seized a cache of ammunition.

Sources said some of that ammunition matches weaponry recovered on the gun-running vessel called the Valhalla, which was used by Bulger and others to ship weapons to the IRA.

It is expected that FBI agents assigned to Durham's special task force will soon be asking Weeks what he knows about Bulger and Flemmi's relationship with the Boston office of the FBI.

That task force is made up of agents from FBI offices around the country — none from Boston. Prior to this assignment, Durham was a prosecutor in the U.S. Attorney's office in Connecticut.

In another development, sources said Boston FBI agent John Newton, who worked with Connolly on organized crime cases, has been charged internally by the FBI with obstruction of justice and lying to a federal officer.

There has been no resolution to that investigation.

One source said internal charges such as those filed against Newton can lead to termination and criminal indictment.

JOINT EXHIBIT 9
94-10287

# FBI man seen pressing police

## Intervened in S. Boston murder case, report says

### By Dick Lehr
GLOBE STAFF

The South Boston bars were emptying out during the early morning of Mother's Day in 1986 when a man carrying a handgun ran out of Triple O's, the most notorious of the drinking places on West Broadway, known as James J. "Whitey" Bulger's clubhouse and operated by one of Bulger's key sidekicks, the beefy Kevin O'Neil.

The pop-pop of gunshots rang out and, in a car parked across from the Triple O's entrance, Tim Baldwin, 23, an ex-con who'd just gotten out of jail, slumped forward, dead. The shooting occurred in front of dozens of witnesses, and Boston police believed they had the shooter: Mark Estes, another ex-con who had been drinking at Triple O's

and was feuding with Baldwin over a woman.

But this was 1986 and Southie was Bulgertown. It was a time when the legendary crime boss Bulger was at an all-time high. Which he was to the ultimate crime boss ... at the old ... a time ... although no one knew it then — when a band of FBI agents in Boston was constantly running interference for Whitey and his gang, addicted to Bulger as a longtime informant.

In another possible example of the extent to which Bulger and his close associates were protected by the FBI, an internal bureau document shows that former agent John Connolly, Bulger's handler, allegedly tried to steer police away from O'Neil, a key witness to the Baldwin murder.

FBI, Page A13

# FBI agent allegedly

**FBI**
Continued from Page A1

The FBI report describes a September 1986 meeting between police Sergeant Detective Brendan Bradley, the lead homicide investigator in the Baldwin murder, and Connolly. Over coffee in the John F. Kennedy federal building, where the FBI's Boston offices were located, Connolly cut to the chase.

"What are you doing to my

friend!" he asked Bradley. Connolly told Bradley that he knew all about a grand jury subpoena just issued to O'Neil.

O'Neil, explained Connolly, was "a good [expletive]" from a good South Boston family. His brother was an injured firefighter. Bradley, according to FBI reports, responded that they were talking about a murder investigation, and O'Neil could give them the shooter. Connolly was

**JOHN CONNOLLY**
Denies meeting with investigator

GLOBE STAFF FILE PHOTO

# intervened in '86 murder case

apparently unmoved.

"But he's a good guy," insisted Connolly, adding that Baldwin, the dead man, was "an [expletive] anyway."

The strained meeting ended. Connolly, according to statements Bradley later gave the FBI, did not "ask directly to withdraw the subpoena to O'Neil," but the homicide detective left with the impression "that was the purpose of the conver-sation." Back at his office, Bradley complained to another officer and to prosecutors.

Connolly, in a brief telephone interview earlier this week, denied such a meeting had taken place. "That's an abject lie, like so many of the other nonsensical fabrications in this whole matter," he said.

Bradley and the two former prosecutors who worked on the Baldwin case declined to comment yesterday.

But during the FBI's 1992 inquiry, one of the prosecutors, John Kiernan, who told investigators that he knew Connolly professionally and socially, said he did not recall Bradley ever complaining about Connolly's behavior in 1986.

Kiernan said he did not "believe Connolly would ever do such a thing." But the other prosecutor, James Hamrock, clearly recalled Bradley returning from coffee with Connolly and telling him about Connolly's move.

na Connolly to the grand jury. But that would only worsen the sometimes tense relations between local prosecutors and the FBI, so it never happened.

Connolly's reported overture did not stop police and prosecutors from pursuing O'Neil, who did appear before the grand jury but refused to testify, citing his Fifth Amendment right against self-incrimination.

Estes had actually been arrested soon after Baldwin's murder, but in court, witnesses recanted their identification of him as the shooter.

"I'm from South Boston," one of the witnesses shrugged, trying to explain the turnabout to the judge. "We keep things to ourselves."

Estes was let go. Nine years later, in June 1995, he was gunned down in South Boston. The Baldwin murder was never solved.

After O'Neil was issued a subpoena to appear before the grand jury, Connolly called Bradley on Sept. 5, 1986.

Bradley called him back. "Connolly said that he wanted to talk," Bradley recalled later, according to FBI reports assembled in 1992 as part of an internal inquiry into possible misconduct triggered by police concerns about Connolly.

Police and prosecutors had decided to go after O'Neil because he was running Triple O's the night Baldwin was killed. The lead homicide detective had developed information that O'Neil "knew all the details of the murder, including the name of the perpetrator."

Connolly asked to meet Bradley for coffee. Three days later the two met in the lobby of the Kennedy building. Bradley arrived first. Connolly, the flamboyant agent known for his fancy suits and coiffed hair, emerged from the elevator carrying only one cup of coffee, for himself.

The agent apologized to the officer about the other, empty hand, saying, "The girls in the office love me and always buy me coffee."

that controlled drug dealing and loan-sharking in the Boston area.

Last month, Connolly, now retired from the FBI and working as a Boston Edison executive, was indicted along with Bulger and his associate, Stephen "The Rifleman" Flemmi, on charges of racketeering, obstruction of justice, and conspiracy to obstruct justice. Connolly was charged, among other things, with tipping them off to an earlier indictment in January 1995. Bulger has been a fugitive since.

The federal probe of FBI corruption, as well as several unsolved murders, is ongoing, part of the undoing of Bulger's once-mythic reign.

In February 1992, Thomas Hughes, then head of the Boston FBI office, notified the investigating agent, John Gamel, about his concern that the inquiry into possible misconduct by Connolly was aimed at an agent who had retired. Connolly had left the bureau in 1990. Hughes also noted that "the statute of limitations may have run."

The matter was revived in 1997 and 1998, when investigators looking at possible FBI corruption again interviewed Bradley about his alleged meeting with Connolly. The encounter originally was scheduled to be revealed during hearings US District Judge Mark L. Wolf held throughout much of 1998, but Bradley was one of a number of witnesses who were dropped after the judge urged both sides to trim the witness list.

Moreover, in his 1998 interview, Bradley seemed to pull back from his earlier statements. He told investigators that he viewed Connolly's overture as trying to put in a "good word" for a friend.

By 1998, Bradley's own career had ended abruptly, amid controversy. The previous year he had been picked up by police in a sting involving prostitutes; Bradley denied any wrongdoing and retired later in 1997.

*Shelley Murphy of the Globe staff contributed to this report.*

JOINT EXHIBIT
94-10287

# Mob victim may have been slain in S. Boston cellar

By Shelley Murphy
GLOBE STAFF

A longtime confidant of fugitive South Boston crime boss James "Whitey" Bulger has revealed at least one of three victims unearthed earlier this month from an unmarked gravesite in Dorchester was killed in the cellar of a home linked to another Bulger associate.

Federal and state investigators recently notified an unwitting South Boston homeowner that they suspected that at least one person was killed in the cellar of his East Third Street house before he purchased it in December 1985 from relatives of Patrick J. Nee, a longtime Bulger associate, according to sources familiar with the investigation.

Kevin J. Weeks, a top lieutenant of Bulger's who began cooperating against him after his own indictment in November on federal racketeering charges, fingered the cellar of Nee's former home as the scene of at least one gruesome killing during the early 1980s, the sources said. They said Weeks, also gave an accurate description of the layout of the basement.

Investigators told the current owner that "one or more of the bodies found in Dorchester) were killed in his cellar," a source said. "They

were able to describe the structural part of the house without seeing it."

The source said investigators asked for permission to videotape the cellar. The homeowner, who asked not to be identified, declined to comment last night, saying, "This has nothing to do with us."

Armed with new information from Weeks, investigators from a number of state and federal agencies unearthed the remains of two men and a woman on Jan. 18 and 14 from a gully alongside the Southeast Expressway across from Florian Hall in Dorchester.

While authorities have yet to identify the victims and are awaiting the results of forensic tests, sources said Weeks claims they are Arthur "Bucky" Barrett, John McIntyre, and Deborah Hussey. They said Weeks implicated Bulger and Bulger's longtime sidekick, Stephen "The Rifleman" Flemmi, and others in their murders.

Barrett, an accused bank burglar, disappeared in July 1983, while McIntyre, and a sympathizer, and Hussey, the daughter of Flemmi's longtime girlfriend, disappeared in fall 1984.

Separate investigations, one by the FBI and the other by Massachusetts State Police, the federal Drug Enforcement Administration, and

the Internal Revenue Service, are currently underway to determine whether Bulger and Flemmi – both longtime FBI informants – killed people after being warned by FBI agents that the victims were cooperating with law enforcement.

Bulger and Flemmi have long been suspects in the murder of Barrett, one of six men charged with the $1.5 million Depositors Trust bank heist in Medford in 1980.

It was revealed in federal court in 1998 that Charlestown gangster Joseph Murray called former governor William F. Weld when Weld was working in the US attorney general's office in February 1988, offering information about Bulger's criminal exploits.

According to a report, Murray claimed Bulger and Nee kidnapped Barrett, looking for money from the Medford heist, and said, "They held him and went to his house and took $300,000; and then they killed him."

But no deal was ever struck with Murray, who died in 1992.

McIntyre, of Quincy, was last seen alive leaving for a meeting with Nee, according to McIntyre's family. Investigators said they believe he was killed because word was leaked to Bulger that McIntyre was cooperating with authorities and had admitted his role in an ill-fated Bulger-

sponsored operation to smuggle 7 tons of weapons to the Irish Republican Army aboard the Gloucester fishing trawler Valhalla.

The shipment was seized at sea after it was transferred to an Irish trawler. Nee and Murray were convicted of gun-running charges in 1987. Although linked to the Valhalla, Bulger was not charged.